Edward F. CLARK, Jr., County Executive of the County of Hudson, et al., Plaintiffs,

v.

Elliot RICHARDSON, Secretary of the Department of Commerce, et al., Defendants,

The Board of Chosen Freeholders of the County of Middlesex, et al., Plaintiff-Intervenors.

Civ. No. 76–2460.

United States District Court, D. New Jersey.

Feb. 24, 1977.

Harold J. Ruvoldt, Jr., Hudson County Counsel, Jersey City, N. J., for plaintiffs.

Cafiero & Balliette, Wildwood, N. J., Andrew M. Higgins, Asst. U. S. Atty., Newark, N. J., Dennis L. McGill, Corp. Counsel, Jersey City, N. J., Hayman, Gorelick & Groon, Wildwood, N. J., Jerome Krueger, Linden, N. J., Julius R. Pollatschek, Kein & Pollatschek, Union, N. J., DeLorenzo & DeLorenzo, Hackensack, N. J., Wm. F. Hyland, Atty. Gen. State of New Jersey, by Herbert K. Glickman, Deputy Atty. Gen., Trenton, N. J., Henry E. Rzemieniewski, Manville, N. J., Milton A. Buck, Newark, N. J., Henry Ramer, Law Dept., Paterson, N. J., William Goddard Lashman, City Sol., Atlantic City, N. J., George M. James, Wildwood, N. J., Francis J. Dooley, Orange, N. J., Dietz, Allen, Radcliffe & Sweeney, Mount Holly, N. J., Martin F. McKernan, Jr., Camden, N. J., Steinberg & Steele, Lakewood, N. J., for defendants.

## OPINION

LACEY, District Judge.

This matter is before the court on plaintiffs' application for preliminary injunctive relief pursuant to Fed.R.Civ.P. 65(a).

Plaintiffs, the Hudson County Executive, the Hudson County Board of Freeholders, and the County itself, filed a verified complaint and Order to Show Cause on December 29, 1976. Named as defendants were the then Secretary of Commerce, Elliot Richardson; the Assistant Secretary of Commerce for Economic Development, John W. Eden; the Regional Director of the Economic Development Administration, John E. Corrigan; the Department of Commerce; and the Economic Development Administration [E.D.A.]. Named as well were 21 state and local governments and governmental bodies of the State of New Jersey. The complaint sought injunctive relief preventing the federal defendants from disbursing, and preventing the state defendants from receiving, funds allocated to the state defendants rather than to plaintiffs, under the Local Public Works Capital Development and Investment Act of 1976, Pub.L.No. 94–369, 90 Stat. 999 [codified at 42 U.S.C. §§ 6701 *et seq.* (1976)] [Local Public Works Act or Act]. Plaintiffs further demanded that the six applications for awards submitted by Hudson County, but rejected by the several defendants, be reconsidered and that the applications be granted.[1]

A hearing was held before this court on December 30, 1976 upon plaintiffs' application for a temporary restraining order. The application was denied for the reasons set forth at the hearing. On January 10, 1977 plaintiffs filed an amended complaint dropping as defendants any state defendants who were classified in the 30% category, which definition is explained *infra*, under the Local Public Works Act, *see* Section 108(d) of the Act, 42 U.S.C. § 6707(d), and adding as defendants all state or local governments for which preliminary approval of grants had been made as of December 30, 1976. *See* 41 Fed.Reg. 46420, *et seq.* (1976).

On January 13, 1977 a further amended complaint was filed substituting the Board of Education of Little Ferry for that of the City of Passaic. A hearing on the application for preliminary injunction was held on January 26, 1977.

Plaintiffs' complaint contains three Counts. In Count One plaintiffs charge federal defendants with "indifference to and violation of statutory standards set forth in 42 U.S.C. 6706 [and] 42 U.S.C. 6707" and "abuse of discretion" when Hudson County's six grant applications for construction projects were not approved.

In Count Two plaintiffs allege that federal defendants approved the grant applications of certain unnamed state and local defendants whose approved projects require the further approval of the Environmental Protection Agency which is allegedly "not scheduled to meet within ninety (90) days next following the approval of the aforesaid grant applications by the Department of Commerce." Because the Act requires that grants may only be awarded to projects whose on-site labor can begin within 90 days of the project approval, federal defendants, plaintiffs charge, have violated Section 106(d), 42 U.S.C. § 6705(d), and abused their discretion.

---

1. I have been advised that similar actions have been brought in various federal courts in other districts: *City of Grand Rapids v. Richardson,* 429 F.Supp. 1087, Civil Action G–77–CA1 (W.D.Mich.1977) (application for preliminary injunction denied on January 24, 1977); *City of Benton Harbor v. Richardson,* 429 F.Supp. 1096, Action K–77–18CA–8 (W.D.Mich.1977) (application for preliminary injunction denied on January 31, 1977); *City of Newburgh v. Richardson,* 77 Civ. 127 (S.D.N.Y.1977) (application for temporary restraining order denied on January 14, 1977); *Lewis v. Richardson,* 428 F.Supp. 1164 (D.Mass.1977) (application for preliminary injunction denied January 27, 1977); *Joram v. Richardson,* 77 Civ. 339 (S.D. N.Y.1977) (application for preliminary injunction denied on February 8, 1977); *Narragansett v. Krepps,* Civil No. 77–D57 (D.R.I.1977) (application for temporary restraining order denied February 4, 1977); *Calaveras v. United States,* Civil No. 77–79 PEW (E.D.Cal.1977) (application for temporary restraining order denied February 10, 1977).

Count Three charges the federal defendants with "arbitrary, unreasonable and capricious" actions in their alleged decision to return one of plaintiffs' applications for a grant, which application was procedurally deficient and needed revision, by United Parcel Service. Said application was sent to plaintiffs by the federal defendants on November 11, 1976 but allegedly not received until December 13, 1976, four days after the deadline date for filing established by the federal defendants for all applications. Plaintiffs resubmitted their application; however, because it was not received by December 9, 1976, it was rejected.

THE ACT

The Local Public Works Act was passed by Congress July 22, 1976. It provides for the authorization by the Secretary of Commerce of grants to state and local governments for local public works projects. Section 103(a), 42 U.S.C. § 6702(a). The Secretary is to act through the Economic Development Administration. Section 102(1), 42 U.S.C. § 6701(1). On August 19, 1976 the Secretary delegated to the Assistant Secretary for Economic Development, who is the chief executive officer of the E.D.A., the functions, powers, duties and authorities vested in the Secretary by the Act. Affidavit of George Karras, Director of the E.D.A., at 3 and Exhibit 2, attached thereto.

Projects chosen under the Act were required to meet one proviso. Section 106(d), 42 U.S.C. § 6705(d), provides:

Grants made by the Secretary under this Act shall be made only for projects for which the applicant gives satisfactory assurances, in such manner and form as may be required by the Secretary and in accordance with such terms and conditions as the Secretary may prescribe, that, if funds are available, *on-site labor can begin within ninety days of project approval.*

(emphasis added).

The Act provides that the Secretary shall, not later than 30 days after enactment of the Act, prescribe rules, regulations and procedures necessary to carry out the Act. Section 107, 42 U.S.C. § 6706. These rules and regulations, the Act further states, shall "assure that adequate consideration is given to the relative needs of various sections of the country." *Id.*

The Secretary must consider, among others, the following factors:

(1) the severity and duration of unemployment in proposed project areas, (2) the income levels and extent of underemployment in proposed project area, and (3) the extent to which proposed projects will contribute to the reduction of unemployment.

*Id.*

The Secretary, according to the Act, must reach a final determination with respect to each grant application "not later than the sixtieth day after the date he receives such application." *Id.* Failure to make such final determination within the prescribed period "shall be deemed to be an approval by the Secretary of the grant requested." *Id.*

Section 108(a) of the Act, 42 U.S.C. § 6707(a), provides for minimum and maximum amounts of grants for each state. Subsection (b) requires the Secretary to give priority to applications of local governments, defined in Section 102(3), 42 U.S.C. § 6701(3), as "any city, county, town, parish, or other political subdivision of a State, and any Indian tribe."

Of the two billion dollars appropriated to carry out the program, 70% of the money was granted to state or local governments having unemployment rates for the three most recent consecutive months which are in excess of the national unemployment rate. Section 108(d), 42 U.S.C. § 6707(d). The remaining 30% was to be available for projects of state or local governments whose unemployment rates for the same three-month period were at or below the national rate. *Id.* This breakdown is what is referred to later as the 70–30 structure.

The federal defendants established state planning ceilings whereby the various states were allocated funds appropriated

under the Act in accordance with a formula based on the share of unemployed workers residing in a state relative to the total national unemployed and the relative 70% of unemployment for each state above the composite unemployment rate for all states. Accordingly, the 70% and 30% priority categories were established within each state planning ceiling. The total allocations for the 70% and 30% priority category areas of the State of New Jersey were $70,026,599 and $30,011,400, respectively.

Subsections (e) and (f) of Section 108, 42 U.S.C. § 6707, provide that the unemployment rates of applicants may at the request of the applicants be based on a community or neighborhood within their jurisdiction, or may be based on those adjoining areas from which the labor force may be drawn. Subsection (g) of the same section provides that applicants should (1) relate their requests to existing approved plans and programs and (2), where feasible, submit requests which will promote or advance long range plans.

Regulations governing requirements and procedures under which applicants could apply and be considered for grants under the Act were published at 41 Fed.Reg. at 46420 *et seq.*

On September 9, 1976, the public was advised of the availability of project application forms and where they could be obtained. Affidavit of George T. Karras, Director of Public Works of the E.D.A. at 4 and Exhibit 6 attached thereto. On October 18, 1976, notice was given to the public that the E.D.A. would begin accepting applications for grants on October 26, 1976. Karras Affidavit at 5 and Exhibit 10 attached thereto. On November 19, 1976, the E.D.A. advised the public that December 3, 1976, was the deadline for submitting applications and December 9, 1976, was the deadline for resubmitting applications which had initially been rejected. Karras Affidavit at 7 and Exhibit 11 attached thereto.

By December 3, 1976, the E.D.A. had received nationally over 25,000 applications for the two billion dollars appropriated to carry out the Act. The applications sought grants totalling over 23 billion dollars. Over 1,338 applications were received from New Jersey alone, seeking over 1.46 billion dollars in grants. Karras Affidavit at 7.

The State of New Jersey was allocated approximately $100,000,000, of which approximately $70,000,000 was earmarked for applicants in the 70% category. Of that $70,000,000, grants totalling $12,437,970 were tentatively proposed for final approval to three communities within Hudson County: Jersey City, Hoboken and Secaucus; 41 Fed.Reg. 56146 (1976).

JURISDICTION

The Amended Complaint alleges jurisdiction under 42 U.S.C. § 6701 *et seq.*, 5 U.S.C. § 701 *et seq.*, 28 U.S.C. § 1331 and the Fifth Amendment of the Constitution.

The Act does not, by its terms, confer, or, for that matter, restrict jurisdiction.

While the circuits are divided on the question of whether Chapter 7 of the Administrative Procedure Act, 5 U.S.C. §§ 701–06, as amended by Pub.L. 94–574, 90 Stat. 2721, contains an independent grant of subject matter jurisdiction, [*see Sanders v. Weinberger*, 522 F.2d 1167, 1169 and n.6 (7th Cir. 1975)], the Court of Appeals for the Third Circuit has held that it does not. *See, e. g., Grant v. Hogan*, 505 F.2d 1220, 1225 (3d Cir. 1974); *Chaudoin v. Atkinson*, 494 F.2d 1323, 1328–29 (3d Cir. 1974); *Zimmerman v. United States*, 422 F.2d 326, 330–31 (3d Cir.), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2200, 26 L.Ed.2d 565 (1970). This view was recently announced by the Supreme Court in *Califano v. Sanders*, —— U.S. ——, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

■ Because there is no clear and convincing evidence of a legislative intent to preclude judicial review, this court will note that a presumption of reviewability of agency action exists. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

■ Jurisdiction exists, pursuant to 28 U.S.C. § 1331 (1966), as amended by Pub.L. 94–574, 90 Stat. 2721 (1976), to review agen-

cy action adversely affecting a person regardless of the amount in controversy. Jurisdiction is, therefore, properly predicated upon this statute.

Plaintiffs, in addition to seeking to enjoin federal defendants from disbursing grant funds and state defendants from accepting said funds, also seek an order directing the federal defendants to approve plaintiffs' grant applications. Plaintiffs' request, though not specifically stated, is in the nature of mandamus relief pursuant to 28 U.S.C. § 1361.

Section 1361 provides that:

The district courts have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

[3] It is well established by the courts that, in order for jurisdiction to lie in mandamus, a plaintiff must allege that the defendant owes him or her "a *clear, ministerial* and *nondiscretionary* duty." *Mattern v. Weinberger*, 519 F.2d 150, 156 (3d Cir. 1975), *vacated*, 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976); *Richardson v. United States*, 465 F.2d 844, 849 (3d Cir. 1972), *rev'd on other grounds*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (emphasis added). That rule was further defined by this circuit in *Mattern*, 519 F.2d at 156.

In order for mandamus to issue, a plaintiff must allege that an officer of the Government owes him a legal duty which is a specific, plain ministerial act "devoid of the exercise of judgment or discretion" [citations omitted]. An act is ministerial only when its performance is positively commanded and so plainly prescribed as to be free from doubt.

(quoting *Richardson v. United States, supra; see also Commonwealth of Pennsylvania v. National Association of Flood Insurers*, 520 F.2d 11, 25–26 (3d Cir. 1975); *Davis v. Shultz*, 453 F.2d 497, 502 (3d Cir. 1971); *Huntt v. Government of Virgin Islands*, 382 F.2d 38, 45 and n. 3 (3d Cir. 1967).

Plaintiffs, citing *Mattern v. Weinberger, supra*, assert that federal defendants owed them a legal duty under the Act and therefore Section 1361 is applicable. In *Mattern*, plaintiff, a recipient of disabled widow's benefits, brought a class action for a declaration that the procedure for recoupment of overpayments of benefits without a provision for a hearing until after the recoupment process had begun was unconstitutional. She alleged that the due process clause imposed an obligation upon the Secretary of Health, Education and Welfare to provide her with an oral hearing before adjusting her benefits. The court found that the duty alleged involved no element of discretion or room for judgment on the part of the Secretary.

Under the same theory, plaintiffs here, as their demand in the complaint indicates, allege that the federal defendants owed them the duty of approving their applications for grants and no element of discretion was involved. This court would be hardpressed to find that assertion true under the circumstances of this case. Section 111 of the Act appropriates the sum of two billion dollars to carry out the purposes of the Act. One hundred million dollars is provided for distribution in New Jersey. Plaintiffs do not challenge or dispute this. The Secretary of Commerce was designated as the authorized federal executive official, acting through the E.D.A. to make grants under the Act. Congress did not provide the E.D.A. with *specific* instructions as to the distribution of the monies on the statewide level. If it had done so, then no discretion would have been involved and mandamus jurisdiction would exist. It did not, however. It provided the Secretary and the E.D.A. with three factors to consider in making their determination and left the actual method to them. With respect to whether the monies would be distributed based on these three factors alone or on a 70–30 scale (*see* discussion, *supra*), as Congress had specifically provided for on the national level, the statute is silent. The E.D.A. used within the states the 70–30 scale, presumably based on the same rationale used by Congress for the national level. It could have chosen an 80–20 scale, or a

90–10 or even a 100% reliance on unemployment rates above the national average.

How the three factors together would be used in the evaluation method was also left to the Secretary. Plaintiffs may argue that the scale could have been otherwise formulated to better accomplish the purposes of the Act, that the application of the scale was erroneous, or that the valuation of the factors, such as the logarithm formula or benchmark system, should have been different; but such arguments go to the merits of the case. At this point it seems that those determinations on the part of the Secretary and the E.D.A. were within the defendants' discretion. Congress, through its omissions and its grant of authority, placed these decisions squarely within the discretion of the Secretary of Commerce. Section 107, 42 U.S.C. § 6706, provides that "[t]he Secretary shall . . . prescribe those rules, regulations, and procedures (including application forms) necessary to carry out this Act."

> Plaintiffs then assert that
>
> the fact that discretion may exist in certain areas does not permit disobedience to the initial and mandatory directives of the Public Works Employment Act, nor does it prohibit the court to order mandatory relief to require the federal defendants to exercise permissible discretion within the confines of the Act.

Plaintiffs' Brief at 21. Plaintiffs rely on the holding in *Pennsylvania v. National Association of Flood Insurers, supra,* in their argument as to permissible discretion. There the state, on its own behalf and on behalf of its citizens, brought an action against the Secretary of Housing and Urban Development, among others, for mandamus and injunctive relief and for damages for its failure to publicize the availability of flood insurance prior to the occurrence of the 1972 and 1973 floods. The statute under which plaintiffs sued, 42 U.S.C. § 4020, stated that "[t]he Secretary shall from time to time take such action as may be necessary in order to make information and data available to the public, and to any State or local agency or official, with regard to—(1) the flood insurance program, its coverage and objectives." The court found that, while Section 4020 did contain language of discretion, the discretion pertained only to the time and manner of acting. 520 F.2d at 26–27. The first step, that of evaluating the necessity of disseminating information, called for exercising discretion and, the court held, mandamus may issue to require its exercise. The court cautioned, however, that the "manner in which the discretionary act is to be performed is not to be directed by the court." *Id.* at 27. *see also McQueary v. Laird,* 449 F.2d 608, 611 (10th Cir. 1971).

In the case at bar, plaintiffs, I find, are essentially requesting that the manner in which the federal defendants perform their discretionary acts is to be directed. I have already found that much of the decision-making as to the evaluation of the applications is within the discretion of the Secretary. This discretion is more than just permissible and cannot be considered ministerial. It is plain that Congress authorized the Secretary of Commerce and the E.D.A. to determine the method of testing applications and to make the ultimate determination of approving the grants on the basis of the tests. Each application had to be separately screened and evaluated and such detailed procedures were necessarily done by the Secretary of Commerce and the E.D.A., acting under him. Indeed, it was stated in the debates on the Act that:

> The Economic Development Administration will be the lead agency in project review and approval under this bill. E.D.A. has a capability to review projects and make sound judgment. E.D.A. has a good track record in public works programs; in its 11 years of existence it has approved over $1.6 billion in public works projects.

122 Cong.Rec. H. 4393 (daily ed. May 13, 1976) (remarks of Congressman Hammerschmidt).

This court will not substitute its judgment or discretion for that of an executive officer. *See Huntt v. Government of Virgin Islands, supra,* 382 F.2d at 45.

Courts cannot invade the jurisdiction of the other departments of government, and for this court to substitute its judgment for that of an agency of the executive branch of government in this matter would amount to such an invasion.

I find, therefore, that jurisdiction does not lie under 28 U.S.C. § 1361.

STANDING

■ In order to obtain judicial review of agency action, plaintiffs must satisfy two requirements: (1) they must demonstrate the existence of a case or controversy within Article III of the Constitution, that is, that they have suffered injury in fact, economic or otherwise, as a result of agency action; and (2) they must be persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702 (1970), that is, the interests they seek to protect must be arguably within the "zone of interests" to be protected by the Act. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins,* 397 U.S. 159, 164, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Director, Office of Workers' Compensation Programs v. Rochester & Pittsburgh Coal Company,* 556 F.2d 565 (3d Cir., filed January 17, 1977); *Shiffler v. Schlesinger,* 548 F.2d 96, 102 (3d Cir., filed January 12, 1977).

■ Whether a case or controversy exists within the meaning of Article III is the threshold question in every federal case. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). While standing in no way depends upon the merits of a plaintiff's claim, *Flast v. Cohen,* 392 U.S. 88, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), it very often turns on the nature and source of the claim asserted. *Warth v. Seldin, supra,* 422 U.S. at 500, 95 S.Ct. 2197, 2206. The injury required by Article III "may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Id.* [citing *Linda R.S. v. Rich-*

*ard D.,* 410 U.S. 614, 617 n.3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)].

■ In the case at bar, the Act, by creating a legal right on the part of certain cities, counties and municipalities to apply and obtain grants for their public works projects, created a right to relief in those injured by the invasion of that right. If the Secretary, appointed to administer the Act, abused his discretion in approving grants, then those injured would have standing to request judicial relief.

■ While a particular statute may confer rights upon a party, it cannot abrogate the constitutional requirement that a plaintiff in fact suffer some injury due to a breach of the law. *Association of Data Processing Service Organization, Inc. v. Camp, supra.*

Defendant Jersey City argues that plaintiffs lack standing in that

[s]hould the court deny the plaintiffs their request, the plaintiffs will not suffer the dire consequences of what the court had in mind when it fashioned the "injury-in-fact" requirement of standing. The constitutent [sic] municipalities of Hudson County, [sic] have so far been allotted $12.3 million. Even if the plaintiffs' requested allocation be granted, it is virtually certain that it could hardly improve on the present allocation.

Brief of Defendant Jersey City at 4–5. Plaintiffs' argument is that if the proper standards were applied, as envisioned by Congress, then some of their projects would have had to have been approved and the county as a whole, including the cities and municipalities, would have received more money. A similar set of facts was presented to the court in *Hartford v. Glastonbury,* Docket Nos. 76–6049, 76–6050, 76–6059 (2d Cir., filed December 23, 1976), where petitioners sued to enjoin seven suburban communities from receiving or expending grants approved by the Department of Housing and Urban Development pursuant to a block grant program authorized by the Housing and Community Development Act of 1974, 42 U.S.C. § 5303 (Supp.1975), which had as its purpose the giving of

federal aid to ameliorate urban problems. Plaintiffs alleged that the grant applications of the suburban communities contained inaccurate or arbitrary estimates of the number of lower income persons "expected to reside" within the community, which was a violation of the statute. Slip opinion at 1083. The district court issued a permanent injunction, finding that the City of Hartford had standing in that if the grants of the defendant communities had been disapproved, the amounts allocated for them would have been reallocated to other areas, among which Hartford would have had a priority position. *Id.* at 1092. On appeal, appellants charged that the City of Hartford lacked standing in that it was in no better position than that of all other towns with approved applications. The court of appeals, affirming the district court, found that this demonstrated "at most that Hartford's financial stake may not be as large as the sum of all the grants involved in this litigation," but "it is a long way from proving that Hartford lacks a stake altogether." *Id.* Quoting K. Davis, Administrative Law of the Seventies, § 22.02–10, at 507 (1976), it stated that " '[t]he line is not between a substantial injury and an insubstantial injury. The line is between injury and no injury.' " Slip opinion at 1092.

That is essentially the issue before me in the case at bar. If the valuation procedures of the Secretary of Commerce are arbitrary, as plaintiffs contend, for the reasons that plaintiffs contend, and if a new valuation method is formed reducing or eliminating the 30% factor which enables cities, counties and municipalities, whose rate of unemployment is below the national average, to receive 30% of the funds allocated, presumably the area of Hudson County, with its level of unemployment, could profit to some extent. The crux of the problem is whether Hudson County as an entity would receive more money rather than the cities and municipalities within it.

The court in *Hartford, supra*, stated: The strong likelihood that Hartford will receive reallocated funds, while not an absolute certainty, is therefore sufficient to establish that Hartford will "benefit in a tangible way from the courts' intervention."

*Id.* at 1093 [quoting *Evans v. Lynn*, 537 F.2d 571, 595 (2d Cir. 1976), *petition for cert. filed*, 45 U.S.L.W. 3346 (U.S. Oct. 29, 1976)]. Plaintiffs do not specifically allege that it was a *per se* abuse of discretion on the part of federal defendants to grant applications of cities and municipalities, rather than of counties as entities; but I will infer that that argument is made by them for purposes of the standing issue.

An added consideration is the fact that the statute provides that counties are included in the definition of local governments which may receive grants under the Act. It contains no provision that if one local government, i.e., that of a city or town, receives grants under the Act, the county which included that municipality is therefore precluded from receiving an award of a grant.

In light of the above-mentioned considerations, I find that plaintiffs have sufficiently shown injury-in-fact as a result of agency action.

In addition to establishing injury in fact, plaintiffs must show that the interests they seek to protect are within the zone of interests to be protected by the statute.[2] The statute here, as those in *Hartford, supra*, and in *Association of Data Processing Service Organizations, Inc., supra*, does not protect a specified group, but its general policy and purpose is plain from a review of its legislative history. Congress, to alleviate to some degree the unemployment situ-

---

2. Professor Davis argues that the "zone of interests" test "is more verbiage than reality." K. Davis, *supra*, § 22.00, at 486. He states: The five reasons . . . for doubting that the "zone" test is the law are that the test is contrary to the APA, the Supreme Court itself has not followed it, the test seems unsatisfactory, only two cases have denied standing on the basis of the test to one who is injured in fact, and all federal courts have generally found ways to escape from applying it. *Id.* § 22.02–11, at 515.

ation and to stimulate the economy, provided for the rapid infusion of two billion dollars into the economy. The intended recipients are unemployed individuals in the construction trade. As the legal entity for the people in a certain geographical area, Hudson County as well as its County Executive and Board have an interest that falls within the zone of interests protected by the Act. There is no doubt that the statute was intended to ameliorate the unemployment problems of Hudson County. While Hudson County is seeking to vindicate its own interests as a legal entity, its interest is, to some extent, congruent with the interests of its unemployed residents. *See Hartford v. Glastonbury, supra,* slip opinion at 1096; *In re Multidistrict Vehicle Air Pollution, M.D.L. No. 31,* 481 F.2d 122, 131 (9th Cir.), *cert. denied, Morgan v. Automobile Mfgrs. Ass'n,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

## SCOPE OF REVIEW

■ Section 701 of the Administrative Procedure Act [APA], 5 U.S.C. § 701, provides that agency action is subject to judicial review except where there is a statutory prohibition on review or where agency action is committed to agency discretion by law. There is a presumption of reviewability. *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 140–42, 87 S.Ct. 1507. The Local Public Works Act does not on its face preclude judicial review, nor is there "clear and convincing evidence" of a legislative intent to restrict review. *Id.* at 141, 87 S.Ct. 1507.

The APA provides for judicial review in Chapter 7. Section 702 provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5 U.S.C. § 702, as amended by Pub.L. 94–574, 90 Stat. 2721. It also provides in Section 701(a) that that chapter "applies according to the provisions thereof, except to the extent that . . . (2) agency action is committed to agency discretion by law."

The statute is clear that the provisions of Section 706, as to what the reviewing court will hold unlawful, do not apply if "agency action is committed to agency discretion by law." This exception is a very narrow one and is applicable "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). See S.Rep.No. 752, 79th Cong., 1st Sess. 26 (1945).

With regard to whether or not the agency finds "law to apply," the courts generally follow the presumption of reviewability unless

(a) congressional intent, whether or not clear and whether or not explicitly stated, is discernible to cut off review, (b) the issues are for some reason deemed inappropriate to judicial determination, or (c) the courts find some other reason they deem sufficient for denying review.

K. Davis, *supra,* § 28.16–1, at 641. The difficulty lies in determining "when the agency action is 'committed to agency discretion' within the meaning of section 10 [now chapter 7] of the Administrative Procedure Act, and when it merely 'involves' discretion which is nevertheless reviewable." *Campaign Clean Water, Inc. v. Train,* 489 F.3d 492, 498 (4th Cir. 1973), *vacated,* 420 U.S. 136, 95 S.Ct. 847, 43 L.Ed.2d 82 (1974); *see also Shiffler v. Schlesinger, supra,* at 100–102.

In *Train,* plaintiffs, an environmental group, brought an action against the administrator of the Environmental Protection Agency challenging his action in withholding from the states 55% of the maximum sum authorized by Congress under the Federal Water Pollution Control Act. The court, finding that the district court had the power to review the action of the administrator, held:

When the executive exercises its responsibility under appropriate legislation in such a manner as to frustrate the Congressional purpose, . . . the executive trespasses beyond the range of its legal discretion and presents an issue of

constitutional dimensions which is obviously open to judicial review.

*Id.* at 498 (footnote omitted).

■ In the case at bar, if plaintiffs' arguments are accepted, federal defendants' exercise of their responsibilities could be said to frustrate the Congressional purpose of the Local Public Works Act. In that respect, the case is subject to review. Additionally, the Act bestows upon the Secretary of Commerce the power to authorize grants based upon a consideration of certain enumerated factors. Whether the Secretary abused his discretion in the application of these factors in the consideration of grant applications is properly reviewable by this court.

■ The standard of review by this court is governed by Section 706 of the APA, 5 U.S.C. § 706, which provides in pertinent part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> . . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . . .

Therefore, the action of the Secretary must be set aside if such action is found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 413–14, 91 S.Ct. 814; *Hartford v. Town v. Glastonbury, supra,* slip opinion at 1103–04.

■ The Secretary's decision is entitled to a presumption of regularity. *See, e. g., Citizens to Preserve Overton Park, supra,* 401 U.S. at 415, 91 S.Ct. at 823, although "that presumption is not to shield his action from a thorough, probing, in-depth review." *Id.*

■ Deference is accorded the construction of a statute by the administrative agency responsible for its implementation. *Griggs v. Duke Power Company,* 401 U.S. 424, 434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *Phillips v. Martin Marietta,* 400 U.S. 542, 545, 90 S.Ct. 496, 27 L.Ed.2d 613 (1971); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

## PRELIMINARY INJUNCTION

I now turn to consider whether plaintiffs are entitled to preliminary injunctive relief on any of the counts of the complaint.

■ Plaintiffs in all three counts of their complaint seek preliminary and permanent injunctive relief preventing the Secretary and the E.D.A. from releasing, and preventing the state defendants from receiving, monies granted to them under the Local Public Works Act. In Count Two plaintiffs allege that the awarding of funds to certain defendants was invalid and they request that those funds be awarded to them. In Count Three plaintiffs request that an allegedly erroneously rejected application by them be accepted. As a prerequisite to the issuance of a preliminary injunction, plaintiffs must show: a reasonable probability of success on the merits; that they will be irreparably injured *pendente lite* if relief is not granted to prevent a change in the status quo; that in balancing the interests involved, the harm to their adversaries' interest from the granting of a preliminary injunction is outweighed by that which will be sustained by them if such relief is withheld; and that the public interest favors granting the relief sought. *Ammond v. McGahn,* 532 F.2d 325, 329 (3d Cir. 1976); *A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515, 525 (3d Cir. 1976); *Oburn v. Shapp,* 521 F.2d 142, 147 (3d Cir. 1975); *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 919–20 (3d Cir. 1974); *Penn Galvanizing Co. v. Lukens Steel Co.,* 468 F.2d 1021, 1023 (3d Cir. 1972); *Winkleman v. New York Stock Exchange,* 445 F.2d 786, 789 (3d Cir. 1971); *Wuillamey v. Werblin,* 364 F.Supp. 237, 241 (D.N.J. 1973).

## BALANCING OF INTERESTS/IRREPARABLE INJURY

There are twenty-seven local governments named as defendants in this action. Each of them has received tentative or final approval of grant applications. Some of them are ready to begin construction of projects which will relieve unemployment and stimulate the economy of the state and their area. Defendants argue that every project delayed inevitably will incur cost overruns when started at a later date. The contracts and subcontracts already entered into based on the approved applications will all be affected to some degree.

There is no provision in the Act to increase the grants if cost overruns occur and the Act requires that 100% of the cost of the project be covered by the grant. If a project is delayed, and the costs increase, by the terms of the Act, therefore, the project no longer qualifies for a grant. Defendants argue that even if the court could fashion an order allowing the E.D.A. to distribute the then less than 100% grants, at best the grantee defendants would have to fund the difference on their own, if possible, and, at worst, projects would totally collapse. Many of the grantees have begun preparation for their projects and believe they would be injured if a delay occurred. *See* Affidavit of John Sweeney, Chairman of Township Committee, Manchester Township, at ¶ 11; Affidavit of Joseph Oakley, architect of Little Ferry project, at ¶¶ 7–8; statement of Jerome Krueger, counsel for Linden, Transcript of Hearing of December 30, 1976, at 38–39; statement of William De Lorenzo, Jr., counsel for Little Ferry, Transcript of January 26, 1977, at 40–41; statement of Siegfried Steele, counsel for Manchester, *id.* at 42.

The federal defendants argue that this court must consider at this stage the implications of a possible permanent injunction at a later date. Such an order, according to defendants, would require the E.D.A. to reevaluate all applications.

The cost alone to the government would be staggering. The time factor would make certain costs overruns in projects which *cannot* be funded under the Act. Contracts entered into by applicants could not begin as scheduled and would lapse. And, clearly, the order would have a nationwide impact on the entire legislative plan, on the federal government and on all state and local governments, an impact impossible of dollar valuation. Brief of federal defendants at 42.

Plaintiffs assert that they will be irreparably injured if defendants are not enjoined from disbursing their funds. Once the monies are disbursed and spent by the state defendants, the issues before the court will be moot.

Plaintiffs' other countervailing argument is essentially that the court has the ability to fashion an accelerated calendar in order that the case may be decided quickly and expeditiously. Presumably, then, defendants would not be injured to any great extent.

Plaintiffs, however, fail to take into consideration the plans already made by the state defendants with respect to their projects. They face the possibility of losing their grants completely or, at the least, paying higher costs for the same jobs. Federal defendants would be forced to stop payment preliminarily, and indefinitely, thereby going against the express purpose of the Act. While plaintiffs' point as to mootness is well taken, the risk to plaintiffs is far less substantial than the injury to both state and federal defendants. In the meantime, this court will do what it can to accelerate the trial of this case.

## PUBLIC INTEREST

If a preliminary injunction is issued, it will halt the $70,000,000 from being spent in this state. Defendants argue that it was the intent of Congress to provide immediate relief to alleviate unemployment and stimulate the economy. This intent would be frustrated by the issuance of an injunction. Two billion dollars has been appropriated. No more can be added to this sum so that the only changes which may occur would be with respect to particular grants. As to Hudson County specifically, its communities

are to receive approximately $12,400,000 for projects within the county. An injunction would freeze those funds and the citizens of the county would suffer immediate harm. If plaintiffs are successful in this action, there is only a possibility that funds will go to plaintiffs' applications. It is possible that a reduction in grants in Hudson County will occur. Even if the same amount is awarded to the county, the only change would be with respect to who spends the money.

Plaintiffs assert that the possibility exists that, if they succeed on the merits, Hudson County as a whole will receive a greater allocation of the $70,000,000 allocated to the State of New Jersey. Even if more money was allocated to Hudson County overall, from the standpoint of the public interest, no actual benefit occurs. There is only a shifting of allocation of funds.

On balance, the benefit to be derived by the New Jersey public as a result of the distribution of these funds and the possible harm to its interest if distribution is enjoined is greater than the possibility of gain to plaintiffs.

## LIKELIHOOD OF SUCCESS

I will dispose of Counts Two and Three at the outset and then deal with Count One separately.

Plaintiffs in Count Two charge that several of the grant applications submitted by certain unnamed defendants involved projects which required the approval of the Environmental Protection Agency prior to commencement of the projects which allegedly was not scheduled to meet within 90 days following the approval by the E.D.A. Complaint, Count Two, ¶¶ 3–4. In approving those grants, plaintiffs allege that federal defendants have violated the precise terms of 42 U.S.C. § 6705(d). They request that these funds invalidly awarded should rightfully be awarded to Hudson County in view of its unemployment rate and the fact that its projects are capable of commencement within 90 days. *Id.* at ¶ 7.

Plaintiffs have named no state defendants in question, provided no information as to the applications of which they are speaking, offered no proof that the Environmental Protection Agency does not meet for 60 days, and submitted no affidavits in support of this allegation. Defendants cannot possibly defend the charges made by plaintiffs without further information. Plaintiffs further allege failure on the part of the E.D.A. to obtain approval for "sewage treatment projects." Amended Complaint, Count Two, at ¶ 3. According to John Hansel, Special Assistant for the Environment to the Assistant Secretary for Economic Development, E.D.A., Environmental Protection Agency certifications were obtained for all sewage treatment projects selected for final consideration. Hansel Affidavit at ¶ 4. On the record at the present time, therefore, I find no likelihood of success on the merits of Count Two of the Amended Complaint.

Plaintiffs in Count Three request that this court order federal defendants to accept the application they submitted with respect to the reconstruction of the 14th Street Viaduct and Park Avenue Bridge in Hoboken, New Jersey. This application was defective and allegedly returned by federal defendants by United Parcel Service, which, at the time, was experiencing delivery problems as a result of a labor strike. Plaintiffs allege that the application, while returned on November 11, 1976, was not received by them until December 13, 1976, four days after the final deadline. They were therefore precluded by the December 9 deadline from having their application considered. Plaintiffs submitted no supporting papers in the form of affidavits, however, to support this Count. Federal defendants assert that the application was returned by use of the United States Postal Service. *See* Affidavit of Corrigan at ¶¶ 63–70. Defendants further assert that County Administrator Dorn of plaintiff Hudson County acknowledged this fact in his resubmission letter, *see* Exhibit C2 to the Amended Complaint, and, at this juncture, I accept this as true.

Accordingly, I must find no likelihood of success on the merits of Count Three as well.

■■ Plaintiffs in Count One charge federal defendants with a violation of the statutory standards set forth in Sections 107 and 108 of the Act, 42 U.S.C. §§ 6706 and 6707, and an abuse of discretion when Hudson County's six grant applications for construction projects were not approved. They allege that the applicable unemployment rate for Hudson County is 12.06% and that the unemployment rate is a "prime consideration" under the Act. They allege further that the unemployment rate is higher than that for all selected grant recipients, with the possible exceptions of Atlantic City, Camden, Florence Township, Gloucester City, Hoboken, Manchester Township, Newark, Passaic, Paterson and Swedesboro and, therefore, they were entitled to approval of their grant applications. Federal defendants, in implementing the Act, were required to consider various factors, among which were unemployment rates and severity and duration of unemployment income levels, the extent to which the proposed project would contribute to reduce unemployment, the type of governmental unit applying, whether the proposed project relates to existing approved plans or programs, and whether the project will advance longer range plans and programs. Sections 107, 108(b) and (g) of the Act, 42 U.S.C. §§ 6706, 6707(b) and (g).

Because of the expected volume of applications, the E.D.A. developed a project selection procedure and project ranking procedure to enable it to process applications on an equitable basis. 13 C.F.R. §§ 316.-10(a)(1) and (2). The E.D.A. employed a computer to assist in the scoring and ranking of the applications.

The basic ranking procedure, specified in 13 C.F.R. § 316.10(a)(2), was based on the above-mentioned requirements of Sections 107 and 108 of the Act, 42 U.S.C. §§ 6706 and 6707. Under the regulations, each application which was not rejected was scored to determine a "basic rank" upon the following factors:

1) The number of unemployed workers in the project area averaged over the three most recent months for which data is available. This factor constituted 30% of a project's basic rank, § 316.10(a)(2)(i)(A);

2) Severity and duration of unemployment as measured by the unemployment rate in the project area. This factor constituted 25% of a project's basic rank, § 316.10(a)(2)(i)(B);

3) The relationship of labor cost to total project costs, defined as the ratio of total wages to total project costs. This factor constituted 30% of a project's basic rank, § 316.10(a)(2)(i)(C);

4) The level of income prevailing in the project area. This factor constituted 15% of a project's basic rank, § 316.-10(a)(2)(i)(D).

The components were then added together to provide a project's basic rank.

Pursuant to the requirements of the Act, 13 C.F.R. § 316.10(a)(2)(ii), provided that the project's basic rank would be increased if the project met one or more of the following criteria:

1) If the project exhibited a potential for providing long-term benefits, its basic rank was increased by a factor of up to 10%, § 316.10(a)(2)(ii)(A);

2) If the project was sponsored by a general purpose unit of local government, its basic rank was increased by a factor of up to 5%, § 316.10(a)(2)(ii)(B);

3) If the project was sponsored by a special purpose unit of local government or a political subdivision of a State, its basic rank was increased by a factor up to 3%, § 316.10(a)(2)(ii)(C);

4) If the project related to existing approved plans or promoted or advanced long-range plans and programs, its basic rank was increased by a factor of up to 5%, § 316.10(a)(2)(ii)(D).

*See generally* Affidavit of Anthony Sulvetta, Chief, Program Analysis Division, E.D.A. The final rank of a project was the sum of the basic rank plus the increase provided for in § 316.10(a)(2)(iii). On the first factor, number of unemployed work-

ers, a special logarithmic transformation was used. As indicated in Exhibit 1 to the Sulvetta Affidavit, a project showing 305,-050 people unemployed received a scaled value of 100. Another project, showing a figure of 169,600 unemployed, received a scaled value of 95.35.

Each project in a given state was to be ranked in comparison only with other projects submitted from within that state and, further, a project was to be ranked in comparison with other projects in such project's priority category. 18 C.F.R. § 316(a)(3). Thus, all projects within a state having a project area with an unemployment rate in excess of the national average unemployment rate for the applicable period was ranked in the 70% priority category and competed for 70% of that state's allocation of the Local Public Works Act funds. All other projects submitted from within that state were ranked within the 30% priority category and competed for 30% of that state's allocation. The scoring procedures were applied uniformly to all New Jersey project applications including those of Hudson County.

The E.D.A. employed a further ranking procedure, termed the "benchmark" system, to avoid an undue concentration of funds to one local government. 13 C.F.R. § 316.-10(a)(3)(iii). According to George T. Karras, Director of the Office of Public Works of the Economic Development Administration, the benchmark was defined as the level of funding for a county, or city, above which undue concentration of program resources would be deemed to have occurred. They

> were determined by finding the ratio between the number of unemployed persons in a particular county and the number of unemployed persons in the state in which the said county was located. Such ratio was then converted into a percentage which was then multiplied by the EDA planning allocation for such state and the product thus obtained was considered as the benchmark of amount that could be expended in such county without causing undue concentration.

Karras Affidavit at 10. Similarly, a benchmark was established for individual cities. *Id.* at 10–11.

The method for selecting projects for final consideration included the following basic procedure:

> In selecting projects for final processing within a county, a Regional Director would first select the highest ranked project in said county in the "A" list and continue selecting projects in that county in order of rank on the "A" list until selection of one more project would cause the cumulative total of costs for projects in that county to exceed the county benchmark. At that point the said project that caused the cumulative total costs for projects to exceed the benchmark was selected for approval and in most instances no additional projects were selected regardless of scores or ranks.

Id. at 10. See Affidavit of John E. Corrigan at ¶¶ 10–58, for an explanation as to why each project within Hudson County was selected and why the Hudson County applications were denied.

Federal defendants, according to plaintiffs, abused their discretion in four ways: the 70–30 division of funds was a violation of the mandates of the Act; the application of the benchmark system was designed to exclude counties from the definition of "local government" in Section 6701(3); the logarithmic transformation served to unfairly dilute the unemployment factors and therefore the rank of Hudson County; and finally that the E.D.A. violated the clear intent of the statute by failing to properly police the applications they received.

With respect to the 70–30 allocation, it is unclear that plaintiffs actually consider this an abuse of discretion. In their brief, it is stated:

> Nor do plaintiffs allege that a statewide distribution of 70% and 30% of funds, respectively, to two separate priority groupings within the state, constitute an abuse of discretion. The Secretary saw fit to establish two separate groupings within each state, rather than estab-

lish separate priority groupings of 70% and 30% on a national level, all within his apparent discretion under Section 107 of the Act.

Plaintiffs' Brief at 13; *see also* discussion in plaintiffs' brief at 14. At a later point, however, plaintiffs take the opposite view:

> The decision to create 70 and 30 per cent pots in every state manufactured unnecessary inequities and created a much severer degree of competition between those given priority for funding by 42 U.S.C. § 6707. Clearly, this decision automatically decreased the possibility of funding to those areas most in need of assistance and suffer [sic] the worst effects of severe unemployment and recession.

*Id.* at 27. Plaintiffs then suggest that "a proper exercise of discretion would have reflected a higher percentage than 70% in order to properly carry into effect the will of Congress." *Id.* at 28, 29.

■ I must note at the outset that, while plaintiffs' original complaint intended to include all local governments in New Jersey who received grants under the Local Public Works Act, the "30%" defendants were then dropped and plaintiffs filed an Amended Complaint including, together with federal defendants, only local governments which would be classified in the "70%" category. I mention that at this time because plaintiffs cannot now seek to enjoin any of the "30%" local governments. They are no longer parties to this action. Any determination made by this court on that issue would, of course, not be binding on them as they are not before the court.

Plaintiffs attack the benchmark system utilized by the E.D.A., on the basis that it was allegedly designed to exclude counties from the definition of "local government" in Section 6701(3). It resulted, they argue, in less-eligible communities receiving grants at the expense of most eligible areas. The mandates of the statute concerning "adequate consideration . . . to the relative needs of various sections of the country" were substantially complied with when the Secretary exercised his discretion

in determining how much of the "not less than one-half of 1 per centum or more than 12½ per centum" the individual states would get.

Plaintiffs do not, however, analyze carefully the alternatives. After a 70–30 breakdown is achieved and each project is ranked, federal defendants had a choice of either distributing the funds completely on a rank basis or having a benchmark which would restrict the amount of money one county or city could receive. If no benchmark was utilized, as defendants indicate, Newark would have received all of the $70,000,000 allocated to New Jersey for the 70% category applicants. Plaintiffs find this conclusion erroneous in that it

> completely overlooks the language óf the statute which states in Section 107 that "the Secretary shall consider *among other factors* (1) the severity and duration of unemployment in proposed *project areas,* (2) the income levels and extent of underemployment in proposed project areas and (3) the extent ·to which proposed projects will contribute to the reduction of unemployment." Section 108 states the Secretary shall give *priority* to unemploymentfactors [sic]. Nothing in the Act would justify the conclusion that using the unemployment factors set forth in the Act would result in Newark receiving *all* of the funds in 70% category area.

*Id.* at 15. The point is, however, that these same factors were already used in giving each project a rank. See analysis above as to how rank is determined. According to the computer chart of all projects, attached to the Corrigan Affidavit as Exhibit A, on the basis of the same factors quoted by plaintiffs, 29 of the Newark projects had the highest rank of any of the other projects submitted in the 70% category in New Jersey. This means that with respect to the number of unemployed workers in the project area, the severity and duration of unemployment, the relationship of labor costs to total project costs, the level of income prevailing in the project area, the long-term benefits, who the sponsor was and whether it promoted long-range plans,

Newark scored the highest. If there were no benchmark for Newark or Essex County, Newark could have received $70,321,311 for its first 22 projects, the complete amount allocated to the 70% category. It should be added that had there not been a 70–30 distribution as well as a benchmark for Newark, it may well have gotten another $8,298,457 for an additional seven projects before any other applicant would have been granted any monies, leaving $21,380,232 for the rest of the state.

I also find that through the use of the benchmark, federal defendants satisfied the requirement, enunciated in the statute, that "adequate consideration [be] given to the relative needs of various sections of the country." Section 107, 42 U.S.C. § 6706. Plaintiffs' argument that this requirement was satisfied when the Secretary utilized his discretion in appropriating the "not less than one-half of 1 per centum or more than 12½ per centum," Section 108, 42 U.S.C. § 6707, is without merit. First, the two quoted portions are in different sections. If Congress had intended that Section 6707 be the fulfillment of Section 6706, Section 6706 need not have been included.

I also find that Section 108, 42 U.S.C. § 6707, shows the intention of Congress that one area of the country not receive a majority of the funds appropriated. That same intention seems reasonably applied to the state level so that one city or one county should not be permitted to receive all or a substantial amount of the funds.

Hudson County was tentatively awarded $12,437,970 in grants, which comprises 18% of the $70,000,000 earmarked for the 70% category. Plaintiffs do not argue that that amount or percentage should have been greater, i. e., that its benchmark was too low, it simply argues that at least some of the monies allocated to Hudson County should have gone to it as a political entity. Its only argument, therefore, as analyzed above, is that no benchmark should have existed.

Plaintiffs also challenge the logarithmic transformation used on the number of unemployed factor. They argue that this factor

> is rendered substantially insignificant by the fact that the defendants arbitrarily reduced the absolute numbers of unemployed to logs instead of proportions (e. g. 100 = 2, 1000 = 3 instead of 100 = 1, 1000 = 10 or 100 = 2, 1000 = 20). The use of logs in this instance is simply a mechanism to implement a political decision that violates the mandate of the Act concerning priorities to be given unemployment factors.

Plaintiffs' Brief at 16. I find this argument to be without merit. If the number of unemployed were not scaled down, then obviously the larger counties would invariably score higher and be ranked substantially higher than the smaller ones even though the percentage of unemployed could be substantially higher. The purpose of the logarithmic transformation "was to provide smaller communities which have a high rate of unemployment but a low number of unemployed an opportunity to participate in the program." Brief of federal defendants at 18 n.9. As illustrated by defendants, a larger community with 5,000 unemployed in a labor force of 100,000 (5% unemployed) would have an insurmountable advantage over a community with 1,000 unemployed out of a labor force of 10,000 (10% unemployed) were it not for the use of the logarithmic method.

I find the logarithmic transformation to have a rational basis and to aid in achieving the purpose of the statute and the intent of Congress. Because there were specifically stated limitations on the distribution of funds, i. e., Sections 107 and 108, 42 U.S.C. §§ 6706 and 6707, Congress clearly indicated its intention to aid high unemployment areas but to prevent the disbursal of all monies to one area of the country. The logarithmic transformation aided in accomplishing this purpose.

Lastly, plaintiffs assert that the E.D.A. violated the clear intent of the statute by "failing to police applications involving extended geographic areas, i. e., applications wherein the unemployment figures of

adjoining communities were present." In support of this argument, plaintiffs cite the affidavit of Dennis Hudacsko, Coordinator of Community Projects for the City of Elizabeth. No more is said about this argument by plaintiffs. The City of Elizabeth is not a party to this action, has not moved to intervene or to join plaintiffs. The affidavit submitted by Mr. Hudacsko contains various points. The one cited by plaintiffs is that according to a memorandum by William Henkel, Jr., Deputy Assistant Secretary for the E.D.A., project areas with populations of over 500,000 will receive special consideration by the regional offices. Hudacsko Affidavit at ¶ A–2. According to him, Union Township and Linden, both in Union County, allegedly fall into that category and should have been scrutinized by the E.D.A. to assure that the "subject project area definitions had not been inflated." *Id.* at ¶ A–6. Then Hudacsko states that according to Robert Munson of the E.D.A. regional office, and Joan Witkowski, the E.D.A. did not attempt to verify the project areas but assumed that the New Jersey State officials had done so. Robert Munson denies this allegation. Munson Affidavit at ¶ 10.

There is no verification of a conversation or memorandum of Robert Munson or Joan Witkowski to support this allegation. No affidavits or correspondence are submitted by them. John Corrigan, Regional Director of the E.D.A., stated that the project area defined in *each* application was carefully scrutinized and given special attention to determine "whether such project area was appropriate for the project described in such application and [was] neither inflated nor too small to support the proposed project." Corrigan Affidavit of January 26, 1977 at ¶ 14. Neither Hudacsko nor plaintiffs state the harm, if any, that resulted from this alleged oversight of the E.D.A., even if the oversight were shown true, and I find that on the record before me it was not. With little more than a citation to an affidavit of a person not a party to the action who alleges facts which are unsupported and denied by the person alleged to have stated them, I can find no abuse of discretion or violation of the intentions of the statute on behalf of the E.D.A.

Plaintiffs point to "additional evidence of federal defendants abuse and/or misuse of discretion," when a North Bergen project (listed under Locator Number L–NJ–0142–0) was listed as a project for Jersey City. The affidavit of Corrigan stated that this project was passed over since Jersey City had already exceeded its benchmark. Id. at ¶ 25. In a subsequently filed affidavit of John Corrigan, he states that his original affidavit was in error and that in actuality he considered the North Bergen project together with one in Secaucus for the last project awarded in Hudson County and had chosen the latter because "it would have greater impact regarding construction jobs and long term benefits in Hudson County." Corrigan Affidavit of January 26, 1977 at ¶ 12. If an error were committed, I would consider it administrative and not an abuse of discretion. On the basis of the second Corrigan affidavit, however, I accept the statements made by the Regional Director as true. Plaintiffs have submitted nothing to rebut the assertion that the Secaucus project was chosen because it would have a greater impact on jobs and long term benefits and I accept this as true.

In conclusion, I find that on the record before me no likelihood exists of plaintiffs succeeding on the merits of Count One. The facts in this case indicate that $12,-437.970 in grant funds was allocated for cities within Hudson County. That amount represented 18% of the total sum allocated for the 70% category counties and cities. These monies went to the highest ranked projects submitted from the Hudson County area to the E.D.A. The meaning of the rank has been discussed *supra*. Suffice it to say that they, according to the criteria outlined in the statute and implemented by the E.D.A., would most alleviate the unemployment situation.

The purpose of the statute was not the construction of public works, for its own sake, but "to alleviate the problem of national unemployment" and "to stimulate

the national economy." 1976 U.S.Code Cong. & Admin.News, at 1746–1747. This is important because while Hudson County as an entity may have been injured in not having its projects accepted, the people of Hudson County, for whom the Act was intended, were well taken care of. As the court found in *Grand Rapids v. Richardson,* 429 F.Supp. 1087, Docket No. G–77–1 (W.D. Mich., filed January 24, 1977), "no one particular grant applicant has a vested interest or any sort of monopoly in being the agent whose public works projects are the vehicle for reducing unemployment. The Legislation is not so concerned with *who* is employing presently unemployed persons, but that *someone* is." At 1093.

The administration of the Act, by the E.D.A., I find, was satisfactory. It is not within my power to say what the best plan for implementing the Act would have been. This court must confine itself to the issue of whether it is consistent with the mandates of Congress and not arbitrary or capricious. I find that it is not. My role is, of course, made easier by the vast discretion given to the Secretary of Commerce by the Act. Section 103(a), 42 U.S.C. § 6702.

I hold, therefore, that, based on the considerations I have outlined above, plaintiffs' motion for preliminary injunction is denied.