**Kenneth D. LEWIS et al., Plaintiffs,**

v.

**Elliot RICHARDSON, Secretary of the Department of Commerce, et al., Defendants.**

Civ. A. No. 77–173–M.

United States District Court, D. Massachusetts.

Jan. 27, 1977.

---

**1166**

Edward J. Grimley, Jr., City Solicitor, City of Lawrence, Lawrence, Mass., Thomas F. Williams, City Atty., Quincy, Mass., for plaintiffs.

James J. O'Leary, Asst. U. S. Atty., Boston, Mass., Robert S. Fastov, Asst. Chief Counsel, Economic Development Administration, U. S. Dept. of Commerce, Washington, D. C., for defendants.

## MEMORANDUM

FRANK J. MURRAY, District Judge.

This case came on to be heard on plaintiffs' application for a temporary restraining order prohibiting federal defendants from disbursing, and defendant local governments from receiving, certain project grants which the federal defendants have heretofore awarded to the other defendants pursuant to the *Local Public Works and Capital Development and Investment Act of 1976*, Title I, Pub.L. No. 94–369, 90 Stat. 999, 42 U.S.C. §§ 6701–6710 (July 22, 1976) [the *Act*].[1]

Plaintiffs are several cities and towns in Massachusetts whose applications for project grants under the *Act* have been denied, and two unemployed construction workers. One is a resident of the City of Springfield and the second, a resident of the City of Lawrence. They seek to represent a class of plaintiffs similarly situated. Federal defendants, the Secretary of Commerce and his subordinates in the Economic Development Administration (EDA), are directly responsible for carrying out the *Act* in respect to the grants to the other defendants, the local governments in Massachusetts whose public works projects have been approved by the federal defendants for funding under the *Act*.

Plaintiffs' ultimate request is for an injunction against payments under the grants, and a further order rescinding the awards and reallocating the available funds for Massachusetts projects under the *Act* to the projects for which they made application to EDA. Upon consideration of the documentary evidence submitted and the arguments of counsel for the parties, the court finds that temporary relief is not warranted for the reasons which follow. Unless otherwise specified, no determination reached herein in arriving at the decision to deny preliminary relief is intended to be a final determination on the merits of the issues involved.

Although certain preliminary issues must be met before proceeding to the merits of plaintiffs' claim, i. e., (1) the court's jurisdiction over the subject matter, (2) standing of the two construction workers,[2] and (3) necessity of a class action certification, the court bypasses these questions at this stage and proceeds to a consideration of the customary requisites for temporary injunctive

---

1. All references to sections of the *Act* will be to the new sections of the *United States Code* which it adds, i. e., 42 U.S.C. §§ 6701–6710. The Regulations were first published in 41 F.R. 35670–74 (Aug. 23, 1976), *as amended*, 41 F.R. 36637 (Aug. 30, 1976), *as amended*, 41 F.R. 38996–97 (Sept. 13, 1976). A complete republication appears at 41 F.R. 46420–24 (Oct. 20, 1976). All citations herein will be to their final form, i. e., 13 C.F.R. §§ 316.1–316.16 (1976).

2. The argument for the inclusion of the individual construction workers from two of the plaintiff cities in this action is that Congress intended for the *Act* to provide employment in the construction industries in the localities receiving grants, and therefore the denial of grants to plaintiff cities wrongfully deprived these individuals (and the class they represent) of such jobs. However, the injunctive relief sought by plaintiff cities, if obtained, is all that is necessary to guarantee the individual plaintiffs whatever benefits they claim from the *Act, cf. Schneider v. Margossian*, 349 F.Supp. 741, 746 (D.Mass.1972). At this preliminary stage, in fact, the issues in respect to standing of any plaintiff remain open. *See generally Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Rental Housing Ass'n v. Hills*, 548 F.2d 388 (1st Cir. 1977).

relief. The court will assume that there is no threshold barrier to the court's jurisdiction, although it may later be determined that the particular action or step in an action was a determination committed to agency discretion.

## I

To be entitled to the extraordinary relief requested, plaintiffs must demonstrate strong likelihood of success on the merits of their claims, and irreparable harm to themselves that will result if injunctive relief is denied that outweighs any which may befall the defendants from the court's intervention. See Automatic Radio Mfg. Co. v. Ford Motor Co., 390 F.2d 113 (1st Cir.), cert. denied, 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968). However, this action is more than a dispute between merely private parties, which requires that the court must consider the effect an injunction would have on the public interest obviously meant to be served by this act of Congress. See Virginia Petroleum Jobbers Ass'n v. F. P. C., 104 U.S.App.D.C. 106, 259 F.2d 921 (1958); cf. M. Steinthal & Co. v. Seamans, 147 U.S.App.D.C. 221, 455 F.2d 1289 (1971). Accordingly, both the terms of the Act and its apparent purposes are relevant in determining whether plaintiffs are entitled to temporary equitable relief.

3. Plaintiffs did not press their constitutional claims at the hearing, focusing their attack instead on the agency's implementation of the statute. Defendants assert that the cities have no legal right to these grants at all which could merit the protection of the Constitution under the Due Process Clause of the Fifth Amendment. See Mil-Ka-Ko Research & Develop. Corp. v. O. E. O., 352 F.Supp. 169 (D.D.C.1972). See also Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1972). As to the Equal Protection claim, municipalities are not "persons" entitled to that shield, see Williams v. Mayor of Baltimore, 289 U.S. 36, 40, 53 S.Ct. 431, 77 L.Ed. 1015 (1933); South Carolina v. Katzenbach, 383 U.S. 301, 323–24, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). But see Aguayo v. Richardson, 473 F.2d 1090, 1100–01 (2d Cir. 1973) (dicta). Therefore, the court finds that 5 U.S.C. § 706(2)(B) is not a ground available to these

## A. Success on the Merits

To the extent that the court is empowered to review the awarding of these grants by EDA under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1970) the scope of that "thorough, probing, indepth" inquiry is delineated in 5 U.S.C. § 706. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413–19, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The grounds for relief that would be available to plaintiffs should there be favorable adjudication of their allegations on the merits are evident: (1) that the agency's action should be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", section 706(2)(A); or (2) that it should be set aside as "in excess of statutory . . . authority, or limitations, or short of statutory right", section 706(2)(C).[3]

Although the Act and the Regulations taken together present a complex mosaic, plaintiffs' theory in support of their claims narrows the dispute. While they do not deny that the limited appropriation under the Act ($2,000,000,000)[4] would necessarily lead to competition between applicants, they contend that the federal defendants utilized a procedure in weighing, approving and disapproving applications that resulted in grants out of the funds for use in Massachusetts (approximately $52,414,-000) in a way that Congress could not have intended.[5] They further allege that the

plaintiffs for setting aside the EDA's determinations.

From the explanations of the operation of the remaining grounds in section 706(2) found in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and other cases, it is likewise apparent that they are inapplicable to this controversy.

4. See Public Works Employment Appropriations Act, Tit. I, Ch. I, Act of October 1, 1976, Pub.L. No. 94–447, 90 Stat. 1497.

5. The complaint contains a second count alleging that certain (though unspecified) projects that had been approved still required a certificate from the United States Environmental Protection Agency, and that since it was impossible for any project to be so approved within the next 90 days, said projects must have been given approval contrary to the explicit restriction in 42 U.S.C. § 6705(d) (on-site labor must be possible within 90 days of approval). In addition to the inherent weakness of this con-

challenged procedure is contrary to EDA's own regulations as published, or alternatively, that it cannot be utilized because it was not promulgated by proper publication.[6]

The procedure concerns the first of four criteria set out in the Regulations which were used to calculate the "Basic Rank" of each project application under the priority provisions of the *Act.* *See* 42 U.S.C. §§ 6706, 6707; 13 C.F.R. §§ 316.7, 316.10.[7] Specifically, 30% of a project's basic rank is premised upon the number of unemployed workers in the project area, especially the number of unemployed construction workers. 13 C.F.R. § 316.10(a)(2)(i)(A). It was conceded by counsel for EDA, as plaintiffs had alleged, that the agency applied to the raw number of unemployed in a project area a logarithmic formula to arrive at a value for purposes of computing the point score of a project (out of a possible 30 points) under the first criterion. Moreover,

the defendants did not deny plaintiffs' contention that the effect of this procedure was to reduce the sharp contrast between the high raw unemployment figure proffered by a large city and the low raw figure presented by a small community.

Defendants respond by arguing first, that the *Act* empowers the Secretary to prescribe "rules, regulations, and procedures necessary to carry out [the] Act", and that these must "assure that adequate consideration is given to the relative needs of various sections of the country". 42 U.S.C. § 6706. Thus, they argue that even assuming the manner in which weight is allocated to raw unemployment figures is judicially reviewable as not "committed to agency discretion" by law, 5 U.S.C. § 701 (which they do not concede), the formula utilizing logarithmic equivalents serves a rational purpose explicitly countenanced by the *Act.* That is, unless the untoward effect of the extremely high raw figures given by urban applicants

tention from its own logical gaps, and beside the fact that without some showing by plaintiffs it was wholly conjectural, defendants factually supported assertions to the contrary appear to be accurate. The affidavit of John Hansel, Special Assistant for the Environment to the Assistant Secretary for Economic Development (Department of Commerce) avers that only one of the Massachusetts grant projects required EPA certification while awaiting approval under the *Act,* and this approval was received for that project from EPA in November 1976.

Accordingly, the allegations under Count II will not be further considered herein. Final resolution of their status in the case as a whole remains unaffected, however.

**6.** These claims pertaining to the infirmity of the Regulations as not validly published are without merit. The *A.P.A.* specifically exempts from the regulations publication requirements ". . . a matter relating . . . to public . . . loans, grants, [or] benefits . . .". 5 U.S.C. § 553(a)(2). Plaintiffs' argument that EDA's voluntary publication in the *Federal Register* and permissive invitation for public comment works an estoppel against the application of this exemption is unpersuasive. Hardship alone does not trigger the doctrine; indeed, often one "must turn square corners when [dealing] with the Government". *See Federal Crop Ins. Corp. v. Merril,* 332 U.S. 380, 68 S.Ct. 1, 91 L.Ed. 10 (1947); *cf. Montana v. Kennedy,* 366 U.S. 308, 315, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961). The case cited by plain-

tiffs, *Rodway v. U.S.D.A.,* 168 U.S.App.D.C. 387, 514 F.2d 809 (1975) presented a fundamentally different situation. In *Rodway,* U.S.D.A. promulgated a *prior regulation* making all of its subsequent regulations regarding those actions excepted by 5 U.S.C. § 553(a)(2) not exempt thereafter. The court found that since the prior regulation itself had the force of law, later rule-making could not proceed without compliance with section 553, even though it concerned matters that would otherwise have been exempt. 514 F.2d at 814. But EDA stated, in each of its voluntary publications, that these Regulations were not subject to section 553, with the clear indication that it was not intended that they would become nonexempt thereby. This manifested intention to retain the exemption of section 553(a)(2) for these Regulations negates any application of estoppel. This court will not penalize an administrative agency for going beyond its minimum duty to inform the public absent the most compelling circumstances.

**7.** Plaintiffs do not appear to dispute the manner in which the other three criteria are computed, or the percentage weight assigned to them out of a possible 100% of Basic Rank. *See* 13 C.F.R. §§ 316.10(a)(2)(i)(B) (unemployment rate: 25%); (C) (labor intensity factor: 30%); (D) (prevailing level of income in project area: 15%). The so-called "bonus factors" which may be added to a Basic Rank are not in issue in this case. *See* 13 C.F.R. § 316.-10(a)(2)(ii)(A)–(D) (1976).

is balanced in this manner with the low raw figures of the small community applicants, "the relative needs of various sections of the country" could not be given "adequate consideration".

Secondly, EDA asserts that since 42 U.S.C. § 6707(c) requires that the Secretary insure the "validity and standardization" of unemployment rates furnished with applications, Congress must have intended that the Secretary's authority include the same responsibility over raw unemployment figures. This second point is not persuasive given specific reference in section 6707(c) to rates with no mention therein of numbers of unemployed, and it is not critical to defendants' argument.

In sum, defendants contend that it is highly unlikely that plaintiffs will prevail on the merits since the use of the logarithmic formula was rationally related to a specific mandate of the *Act,* and within the scope of authority delegated to the Secretary by Congress, negating application of 5 U.S.C. § 706(2)(A); and further, that it was well within the Secretary's statutory authority, rendering 5 U.S.C. § 706(2)(C) inapplicable. In view of the case law governing the standards by which this court's examination of EDA's decisions will be guided, it is apparent from the following analysis that plaintiffs' probability of success is minimal.

■ 1. The *Act* vests wide discretion in the Secretary to prescribe criteria for selecting grant recipients, albeit within some broad and some specific guidelines. *Compare* 42 U.S.C. § 6706 *with id.,* § 6707. The regulations and procedures promulgated pursuant to that authority come clothed with a presumption of regularity and validity, *United States v. Boyd,* 491 F.2d 1163 (9th Cir. 1973), which presumption also attaches to the actions of an administrator in the absence of clear evidence to the contrary. *See Maryland Nat'l Capital Park &*

*Planning Commission v. Lynn,* 168 U.S.App. D.C. 407, 514 F.2d 829 (1975); *Udall v. Washington, Va. & Md. Coach Co.,* 130 U.S. App.D.C. 471, 398 F.2d 765 (1968), *cert. denied,* 393 U.S. 1017, 89 S.Ct. 620, 622, 21 L.Ed.2d 561 (1969). The assumption is that the expertise of the agency merited the confidence of Congress that the legislation would be effectuated properly at the hands of the designated administrator. Plaintiffs must refute that assumption as part of the heavy burden they carry in demonstrating that the facts of their claim rebut the above presumptions in favor of the federal defendants. *See United Black Fund v. Hampton,* 352 F.Supp. 898 (D.D.C.1972).[8]

■ 2. The heart of plaintiffs' complaint is that Congress meant for the *Act* to benefit local governments with large numbers of unemployed workers, and not mainly those with high rates of unemployment. Thus, insofar as this was intended to be the major factor in assessing eligibility for project grants, they urge that use by EDA of the logarithmic procedure frustrates this central congressional purpose. However, the court accepts the arguments of the federal defendants that EDA's adoption of the logarithmic formula for assessing the relative severity of unemployment in competing project areas was a rational approach to carrying out its responsibilities under 42 U.S.C. § 6706, i. e., to ". . . assure that adequate consideration is given to the relative needs of various sections of the country". "It is enough that the Administrator has acted within the statutory bounds of his authority, and that his choice among possible alternative(s) . . . is one which a rational person could have made." *Federal Security Adm'r v. Quaker Oats Co.,* 318 U.S. 218, 233, 63 S.Ct. 589, 598, 87 L.Ed. 724 (1943). The court is not permitted to substitute its judgment for that of the agency specifically designated by Congress to carry

---

**8.** Although the parties did not bring it to the court's attention, it appears that the Regulations were subjected to oversight hearings shortly after their publication, which resulted in no criticism of them by the subcommittees involved. *See Joint Hearing Before the Subcommittee on Economic Development and the* *Subcommittee on Investigations and Review of the House Committee on Public Works and Transportation,* 94th Cong., 2d Sess., "Public Works Employment Act of 1976, Review of Regulations to Title I—Local Public Works Capital Development and Investment Program", August 31, 1976.

out the *Act. See Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. 814; *Columbia Broadcasting System, Inc. v. F.C.C.,* 147 U.S.App.D.C. 175, 454 F.2d 1018 (1971). Plaintiffs have, therefore, failed to make a strong showing of a likelihood that they will eventually convince the court that disbursement of these funds should be enjoined.

## B. Irreparable Harm

### 1. *Plaintiffs*

Plaintiff cities point to the limited funds available under the *Act* as a whole, and the specific amount which the federal defendants admit is all that is available for projects in the Commonwealth under the first appropriation, for their argument that unless these allegedly wrongful allocations are enjoined they will lose forever the opportunity to receive their rightful share of participation. In opposition, defendants again assert that no "harm" results from the denial of a grant-in-aid prior to actual receipt or an unequivocal finding of entitlement. The court will assume *arguendo* that plaintiffs' loss of the opportunity to participate in the program, if shown to have resulted from erroneous actions of EDA, constitutes a legal harm; and further, that because funds committed to the local government defendants are likely to become irretrievable, such harm would be irreparable.

### 2. *Federal Defendants*

Without agreeing with plaintiffs that little harm, if any, would result to the federal administrators from a simple delay in making these disbursements, the court assumes, again solely for purposes of argument, that the administrative inconvenience so incurred would be far outweighed by the harm to plaintiffs that is described above.

### 3. *Local Government Defendants*

Naturally the total loss of a grant would result in immeasurable and irreparable harm to these defendants, but in the present context the consideration must be whether a delay in disbursement ordered by the court *pendente lite* would result in a loss to them not otherwise recoverable. At the hearing several of these defendants appeared and presented, through affidavit or upon representation of counsel, specific examples of losses that could befall them in the event of a court-ordered delay.[9]

As in the case of plaintiffs, the court must again proceed on assumptions concerning these claims, despite the efforts of counsel for these defendants to expand upon the factual record. While it is not altogether clear that plaintiffs are entitled to have their alleged loss balanced against that which these defendants might suffer as a result of the allegedly improper actions of the federal defendants, *cf. Pullman, Inc. v. Volpe,* 337 F.Supp. 432 (E.D.Pa.1971), the court again assumes that the balance of harm remains slightly in favor of plaintiffs at this point.

### 4. *The Public Interest*

█ The resolution of the above balancing in favor of plaintiffs enables the court to address the important factor of the public interest in the decision to deny temporary relief. An impressive line of authority supports the proposition that before a court will enjoin an administrative action it must be satisfied that the public interest will not

---

**9.** Several of the local government defendants who appeared argued that their particular grants were awarded out of funds designated in the *Act* for communities with unemployment rates less than the national average but over $6\frac{1}{4}\%$, the so-called "30% funds". *See* 42 U.S.C. §§ 6707(c)(2), 6707(d). They further assert that plaintiff cities, by their own admission, are vying only for those priority funds allotted for localities with unemployment rates in excess of the national average, the so-called "70% funds". *See id.,* §§ 6707(c)(1), 6707(d).

Thus, the defendants who have received 30%-fund grants object to their inclusion in this suit at all, and of course oppose relief restraining the payment of funds to which plaintiff cities could never be entitled.

In light of the conclusions reached in this memorandum, however, these defendants' grants are not in jeopardy. Moreover, ample procedures exist through which they may seek their dismissal as parties from this action. *See* Fed. R.Civ.P. 12(b), 54, 56.

be adversely affected by an interruption if the validity of the order is ultimately sustained. The leading case is *Virginia Petroleum Jobbers Ass'n v. F.P.C., supra,* cited with approval in *Permian Basin Area Rate Cases,* 390 U.S. 747, 773, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). The *Virginia Petroleum Jobbers* court posed the issue as follows:

> Where lies the public interest? In litigation involving the administration of . . . statutes designed to promote the public interest, *this factor necessarily becomes crucial.* The interests of private litigants must give way to the realization of public purposes. . . . [It must be determined] . . . how the court's action serves the public *best.*

259 F.2d at 925 (emphasis added). *Accord, Pennsylvania v. U. S. Dept. of Agriculture,* 469 F.2d 1387 (3rd Cir. 1972); *Eastern Air Lines, Inc. v. C.A.B.,* 261 F.2d 830 (2d Cir. 1958). *See also Yakus v. United States,* 321 U.S. 414, 440–41, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

From the terms of the *Act* itself it is apparent that its purpose was to stimulate employment, particularly in the construction industry, while at the same time enabling local governments to complete public works projects that would render a more lasting benefit within those jurisdictions. But the overriding emphasis throughout the legislation and its history is on the need for expeditious, even urgent, implementation of the *Act* on a nationwide scale. *See* 42 U.S.C. § 6705(d) (applicant must assure that on-site labor can begin on project within 90 days of approval); section 6706 (30 days to publish Regulations from date of enactment; applications automatically approved if not acted upon within 60 days of receipt); H.R.Rep. No. 94–1077, at 2 U.S.Code Cong. & Admin.News 1976, p. 1746 (Mar. 24, 1976) (grants to be made for projects ". . . which can begin quickly to reduce unemployment and stimulate construction and related industries"); S.Rep. No. 94–710 (Apr. 30, 1976). Indeed, the Congress attached sufficient importance to the immediate passage of the *Act* that both Houses acted rapidly to override a presidential veto

without modification. *See* 90 Stat. 1011–12 (July 21–22, 1976).

It is true that plaintiffs also represent the "public interest" to a degree, particularly in respect to the final adjudication of the merits of their claims; but the federal defendants are presumed to be acting in furtherance of the vastly greater national interests which the *Act* is intended to benefit. Where Congress has made clear its intention that these funds be infused into local economies as quickly as possible, the monumental harm that would befall that benefit to the public generally from a restraint imposed by the court eclipses that alleged by the plaintiff cities. The court could not justify such intervention on the basis of plaintiffs' low probability of success on the merits. *See M. Steinthal & Co. v. Seamans,* 147 U.S.App.D.C. 221, 455 F.2d 1289, 1301–03 (1971) (exigent needs of government may preclude equitable relief, even where impropriety of agency action is apparent and ultimate compensation may be unobtainable).

Accordingly, plaintiffs' application for a temporary restraining order is hereby denied.