**Kwadwo OFOSU, Petitioner–Appellant,**

**v.**

**Edward McELROY, Acting District Director of the New York District of the Immigration and Naturalization Service, Respondent–Appellee.**

No. 669, Docket 96–2419.

United States Court of Appeals, Second Circuit.

Argued June 25, 1996.

Decided Oct. 22, 1996.

---

Bradford H. Sewell, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Petitioner–Appellant.

F. James Loprest, Jr., Special Assistant United States Attorney, Southern District of New York, New York City, for Respondent–Appellee.

Before: MINER, JACOBS, and PARKER, Circuit Judges.

JACOBS, Circuit Judge:

Petitioner-appellant Kwadwo Ofosu filed a petition for a writ of habeas corpus, pursuant to Immigration and Naturalization Act ("INA") § 106(b), 8 U.S.C. § 1105a(b), and 28 U.S.C. § 2255, challenging a July 25, 1994 exclusion order issued by the Board of Immigration Appeals ("BIA"). The United States District Court for the Southern District of New York (Sotomayor, J.) denied Ofosu's petition. Ofosu has moved in this Court, pursuant to Fed. R.App. P. 8(a), for a stay of the BIA's exclusion order pending Ofosu's appeal from the district court's judgment. Edward McElroy, District Director of the New York District of the Immigration and Naturalization Service ("INS") cross-moved to dismiss Ofosu's appeal on the ground of fugitive disentitlement.

By order entered on June 26, 1996, we granted the motion for a stay, over the dissent of the writer of this opinion, and unanimously denied the cross-motion to dismiss. For the following reasons, the stay heretofore granted on June 26, 1996, is now conditioned upon the petitioner's prompt surrender to the INS for possible parole revocation. The cross-motion to dismiss the appeal is denied as moot in light of the condition placed upon the grant of the stay.

## BACKGROUND

*Arrival and Parole.* The INS detained Ofosu, a Ghanaian national, upon his arrival in the United States, and commenced exclusion proceedings against him pursuant to section 212(a)(6)(C) and (7) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1182(a)(6)(C) and (7). Two months after his arrival, Ofosu applied for asylum pursuant to INA § 208(a), 8 U.S.C. § 1158(a), claiming "a well-founded fear of persecution on account of ... political opinion," INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). In the alternative, Ofosu sought the withholding of return to Ghana, claiming that his "life or freedom would be threatened" in that country "on account of ... political opinion." INA § 243(h)(1), 8 U.S.C. § 1253(h)(1).

The District Director of the New York Office of the INS temporarily paroled Ofosu into the United States pursuant to 8 C.F.R. § 212.5(b).

*Proceedings Before the IJ and BIA.* Ofosu appeared with counsel on June 9, 1992 for an exclusion hearing. An interpreter translated between Ashanti, which is Ofosu's native language, and English. Counsel conceded that Ofosu was excludable under INA § 212(a)(7), for failure to carry a valid passport, but stated that Ofosu sought asylum or the withholding of return. The immigration judge continued the proceeding until July 26, 1993. An exclusion hearing was held on that date, with Ofosu again represented by counsel, and with an interpreter translating this time between Twi, a language virtually identical to Ashanti, and English. Ofosu was the only witness at the exclusion hearing, and he testified that he worked for eight years as a "senior officer" of the Committees for the Defense of the Revolution ("CDR"), a government organization of somewhat uncertain purpose. The CDR was neither a police force nor a military organization, but one of its roles was to persecute enemies of the regime: "When you do[ ] something against the government ... we usually go in with force." Most of the members of the CDR, including Ofosu, were unarmed. Ofosu testified that he made many arrests, knew that people were being tortured, and thought that some were killed, but his testimony (set forth in the margin) can be read to say both that that he did witness these things and that he did not.[1] Ofosu emphasized: "I have made

---

1. Q. [A]fter the person was arrested, did you ever speak to them at all?

    A. We have senior officers who never go out. They were not supposed to let people know that they were members of the CDR. We

make the arrest, hand those people over to them, and we are done.... So our duty was to make the arrest, no questions....

so many arrest[s], I cannot give you the number. That's why I'm scared [for] my life, because now ... I am enemy to the general public because of the arrest[s] that I've made, I'm now a[n] enemy to the government...." He also said that he performed a variety of duties, including chasing smugglers who were smuggling cocoa out of the country.

In an affidavit filed in 1995, Ofosu averred that his testimony had been distorted in translation and that he was generally unaware of the part that the CDR played in the violent suppression of political dissent. He indicated in that affidavit that the organization was mostly concerned with economic crimes and with enforcing work requirements, and had the overall mission of supporting the Marxist government of Lt. Rawlings.

In any event, Ofosu testified at the hearing that there came a time when he refused to arrest political opponents of the regime because he knew that harm would come to them if they were arrested; that he encouraged other officers of the CDR not to make arrests; that, on occasion, when he was sent to make arrests, he falsely reported that the people he was sent to arrest were not at the location to which he was sent; that two of his colleagues, who followed Ofosu's example and refused to make arrests, were themselves arrested; and that Ofosu was told by a soldier that someone was about to arrest him, after which Ofosu left Ghana.[2]

> Q. All right. Now you said that sometimes those prisoners were killed? Isn't that correct?
> A. I said I think that—I'd—I've never seen anybody being killed, apart from those who were sent to face the firing squad. So since they were not allowed visitors in there, nobody knew what happened to them. We think, or I think they have been killed. I've never seen anybody—anybody being killed.
> Q. Did you see anyone shot by a firing squad?
> A. Yes. We were not allowed to go there, but I saw at least one being shot by a firing squad.
> Q. As far as you know, was that person—did that—did that person have a trial?
> A. Yes. Uh, those who were sent to face the firing squad were usually given trial. And so those were published in the newspapers and on the radio too, before they (indiscernible) the firing squad.

At the end of the hearing, the immigration judge denied asylum and ordered Ofosu to be excluded, on the ground that Ofosu offered insufficient evidence of a threat of persecution or harm to his life or freedom because of his race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. §§ 1158(a), 1253(h). *See also id.* § 1101(a)(42)(A). The only such evidence was "the applicant's own unsubstantiated and conclusionary statements." The immigration judge also noted that an applicant for asylum must show "that he would merit relief of political asylum as a matter of discretion," and that Ofosu's involvement in "a quasi-political police force" weighed "heavily" as "an unfavorable factor" against any factors that might militate in favor of asylum.

Ofosu appealed to the BIA and also moved to reopen the record in order to introduce into evidence a Ghanian warrant for his arrest to substantiate his fear of persecution. On July 25, 1994, the BIA issued an order and opinion that dismissed the appeal from the IJ's order denying asylum and the withholding of return and denied the motion to reopen. The BIA rested its decision to deny asylum on the distinct ground that Ofosu is ineligible because he is not a "refugee," *see* 8 U.S.C. § 1158(a), a term that excludes "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of ... political opinion," *id.* § 1101(a)(42); *see also id.*

> Q. All right. Now as far as you know, were people arrested by the CDR, and held the CT—CDR ever tortured?
> A. Yes. Most of them were tortured. Because we saw one torture you that, uh, you would never think of, uh doing anything against the government, if you were released.
> Q. Did you ever see anyone who was being tortured, or had been tortured?
> A. Yes. I saw one who had been tortured, but I never saw anybody being tortured.

2. Whatever the nature of this resistance, it seems to have been brief, because the first time he "openly" defied a CDR order was when he failed to arrest political protesters at a rally on February 17, 1992—eighteen days before he arrived in the United States. Part of that time he spent en route in Nigeria, where, according to Ofosu's testimony, an acquaintance helped him obtain a false passport.

§ 1253(h)(2)(A). Specifically, the BIA found that Ofosu "arrested individuals on the basis of their political opinion" who "were subsequently imprisoned indefinitely, tortured, and in some instances killed." As to the warrant for Ofosu's arrest, the BIA denied the motion to reopen on the ground that the document was available at the time of the original exclusion hearing.[3]

*Habeas Corpus Proceeding.* Ofosu thereafter filed in the Southern District a motion pursuant to INA § 106(b), 8 U.S.C. § 1105a(b), and 28 U.S.C. § 2255, for habeas relief from the BIA's order. Adopting and approving a report and recommendation from a magistrate judge, Judge Sotomayor denied the petition in a decision dated May 6, 1996. The district court concluded that the BIA's determination "is amply supported by the record." Specifically, the district court ruled that the "[a]rrest of persons the petitioner believed would be killed or tortured (or merely imprisoned indefinitely without trial) on account of their political actions constitutes persecution of the kind Congress considered sufficiently abhorrent to disqualify an application for refugee status." As to Ofosu's claimed change of heart, the district court observed: "However commendable his conversion, Congress did not enact an exception to the statute at issue which absolves a persecutor of his past on account of a belated crisis of conscience."

*Ofosu's Disregard of His Parole Status.* By letter dated May 13, 1996, the INS ordered Ofosu, who was still on parole, to report to the INS at 9:00 a.m. on May 28, 1996 for exclusion to Ghana. At a May 23, 1996 hearing before the district court, the INS and Ofosu entered into a judicially approved stipulation that, if Ofosu filed by May 30, 1996(1) a notice of appeal from the district court's denial of habeas corpus and (2) a motion in this Court for a stay of exclusion pending appeal, then "[a] stay of deportation and exclusion will be in effect until disposition of the request for a stay by the Second Circuit." [4]

The transcript of that hearing reflects Ofosu's perfect understanding that, notwithstanding the stay of *exclusion,* he was still required to *present himself* for possible revocation of parole at 9:00 a.m. on May 28. At that hearing, his counsel expressly sought a stay that would allow him to ignore the surrender order, arguing: "They may put him in detention. That is a risk that is not acceptable." But Judge Sotomayor responded:

> The only risk to your client that is irreparable is the risk of being sent back, not the risk of staying in jail for 6 to 9 months. You have a very hard time convincing me I should stay his presentation. The only ... irreparable injury to him is one that kicks him out, returns him to another country.

Shortly thereafter, the judge ruled: "I am not going to stay presentation, merely stay deportation from today until Tuesday [May 28]." And again: "I am only giving you a stay of exclusion, not of presentation."

Ofosu filed his notice of appeal on May 24, 1996, together with a motion addressed to this Court for "[c]ontinued parole and *stay of surrender to the INS* pending appeal or until a hearing on the merits" (emphasis added). That day, this Court (Kearse, *C.J.,* in chambers) issued an order staying Ofosu's surrender until 1:00 p.m. on May 28, 1996. On the morning of May 28, 1996, a panel of this Court (Van Graafeiland, Walker, Leval, *C.JJ.*) heard oral argument and denied Ofosu's motion.

Counsel for the INS then orally reminded Ofosu's counsel that Ofosu was expected to surrender that afternoon, at the expiration of the interim stay entered by Judge Kearse. Also on May 28, counsel for the INS faxed a letter to Ofosu's counsel confirming that Ofosu "is required to present himself to the INS's offices at 26 Federal Plaza in New

---

**3.** This reference to a warrant is odd considering Ofosu's description of how the warrantless techniques of the CDR differed from those of the ordinary police: "Where[as] the police would be asked the authority—papers ... authorizing them ... people were not scared of the police as they were scared [of] us. We ... did not ask any questions. We go in there, make arrest."

**4.** Although deportation and exclusion are distinct concepts in immigration law, *compare, e.g.,* 8 U.S.C. § 1226 *with id.* § 1252, the parties sometimes use these terms interchangeably, and this opinion will do the same except where the distinction is necessary.

York today." The letter continued: "As we ... informed you this morning, when Mr. Ofosu appears at the INS's offices, he will be entitled to present the INS with any request he may wish to make for continued parole." At 1:14 p.m., Ofosu's counsel sent a purportedly confirmatory fax that unilaterally changed the time for surrender: "As we discussed this morning, I have advised my client that the government expects [Ofosu] *to surrender by the end of today*" (emphasis added). At 4:25 p.m., Ofosu's counsel faxed another supposedly confirmatory fax. This one barely masked Ofosu's contemptuous refusal to surrender:

> As we discussed this morning, we still require written notice that Mr. Ofosu must surrender to the INS, the reason for doing so, the details of this surrender (*e.g.,* time and place), and the legal authority under which the surrender is required. *This need for written notice is notwithstanding the Second Circuit's denial of Mr. Ofosu's request for a preemptive stay from such a surrender and the government's informal expectation that he will surrender.* If in fact his parole is being terminated, written notice of this action is also requested and, as I related this morning, should be according to proper regulatory procedure. Mr. Ofosu has received a notice to surrender for deportation; however, this notice is no longer operable in light of the District Court's stay of his deportation pending the Second Circuit's consideration of a stay request to be filed no later than May 30, 1996.

> Also, as my telephone message indicated, I did not receive the first page of your letter to me transmitted by telecopy today.

> Please feel free to call if you have any questions.

(Emphasis added.) Ofosu did not report to the INS on May 28, or thereafter.

On May 29, 1996, Ofosu's counsel faxed another letter to the INS, which reported his delayed receipt of "a full copy" of the INS's May 28 letter, and proceeded to escalate Ofosu's demands on the INS:

> [I]f the INS desires that my client "surrender ... for a custody determination," as your letter states, please have the proper INS form/order delivered to me. It is essential that we observe all applicable regulatory procedures on this matter. In light of the possible grave consequences of what you request, it is imperative that I and my client understand his rights and obligations prior to compliance and that all procedural regularities are followed.

*The Present Motion and Cross–Motion.* On May 30, 1996, Ofosu filed in this Court the present motion for a stay of exclusion pending his appeal of the district court's denial of habeas corpus. On June 12, 1996, the INS cross-moved to dismiss Ofosu's appeal on the ground that "Ofosu's failure to surrender to the INS disentitles him from any judicial review of his exclusion order." Following oral argument, this Court granted Ofosu's motion and denied the INS's motion. Because our present ruling on the stay obviates or moots the cross-motion, we do not address the cross-motion.

## Discussion

■ A request for a stay is an appeal to equity. Whatever the equities would be if Ofosu were in custody as directed, they are changed by his non-cooperation with a system from which he demands elaborate procedural deference.

■ We treat a motion to stay an order of exclusion as we treat any other motion for injunctive relief. *See Michael v. INS,* 48 F.3d 657, 664 (2d Cir.1995). Specifically, this Court should consider

> whether: (1) [Ofosu] will suffer irreparable injury absent a stay; (2) the INS will suffer substantial injury if the stay is issued; (3) [Ofosu] has demonstrated a substantial possibility ... of success on appeal; and whether (4) the public interest may be affected.

*Id.*

■ *Relative Harm to Ofosu and the INS.* Ordinarily, when a party seeks an exclusion pending appeal, it is deemed that exclusion is an irreparable harm, and that the INS suffers no offsetting injury. *See, e.g., id.* In this case, however, Ofosu's fugitive status diminishes the risk that he will suffer harm if the stay is denied and increas-

es reciprocally the risk of harm to the INS if a stay is granted.

Ofosu's breach of parole is not contestable. Ofosu concedes, as he must, that the INS has the authority to terminate his parole. An alien has no constitutional right to initial admission to the United States. *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982) (citing *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950), and *Nishimura Ekiu v. United States*, 142 U.S. 651, 659–60, 12 S.Ct. 336, 338–39, 35 L.Ed. 1146 (1892)); *see also Augustin v. Sava*, 735 F.2d 32, 36 (2d Cir. 1984) (citing *Shaughnessy v. United States ex rel Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953)). Congress has provided by statute that an alien denied entry who is awaiting exclusion proceedings may be temporarily paroled into the United States, at the discretion of the Attorney General (acting through the INS); however, "such parole of such alien shall not be regarded as an admission of the alien" into the United States. 8 U.S.C. § 1182(d)(5)(A); *see also* 8 C.F.R. § 212.5; *Bertrand v. Sava*, 684 F.2d 204, 212 (2d Cir.1982). When, "in the opinion of the Attorney General," parole is no longer warranted, "the alien shall forthwith return . . . to the custody from which he was paroled." 8 U.S.C. § 1182(d)(5)(A). The INS may demand at any time that the alien return to custody. *See id.* There is simply no basis for Ofosu's insistence that the INS leap procedural hurdles to terminate parole or compel Ofosu's appearance. Parole can be terminated automatically "without written notice . . . at the expiration of the time for which parole was authorized." 8 C.F.R. § 212.5(d)(1)(ii). Alternatively, when (*inter alia* ) "in the opinion of the district director . . . neither emergency nor public interest warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien[,] and he or she shall be restored to the status which he or she had at the time of parole." *Id.* § 212.5(d)(2)(i).

In short, Ofosu has not been admitted to the United States and has no right to be at large. His parole is a matter of the Attorney General's discretion (and of the opinion of those she appoints) and may be ended without hearings or special forms. The notice for Ofosu to surrender was written and clear, it was reiterated orally and in writing, and it was reviewed by five federal judges, not to mention this panel. The authority underlying the notice was conceded (at various points) by Ofosu's own counsel. Ofosu's refusal to surrender is a violation of his parole. The letters faxed by Ofosu's lawyer try to mask this misconduct, demanding that the INS give notice "according to proper regulatory procedure" on the "proper INS form/order" so that "we observe all . . . regulatory procedures" as well as "all procedural regularities."

In immigration cases, courts have not hesitated to take an alien's conduct into account when deciding on the propriety of injunctive relief. *See Zapon v. United States Dep't of Justice*, 53 F.3d 283, 285 (9th Cir.1995) (denying attorney's fees under Equal Access to Justice Act because aliens "engaged in self-help" and became fugitives from still-outstanding order to surrender for deportation); *Bar–Levy v. United States Dep't of Justice*, 990 F.2d 33, 35 (2d Cir.1993) (dismissing appeal of BIA deportation order by alien who refused to surrender to INS and became fugitive); *Hussein v. INS*, 817 F.2d 63 (9th Cir.1986) (dismissing appeal of alien who escaped from federal custody and became fugitive); *Arana v. INS*, 673 F.2d 75, 76–77 (3d Cir.1982) (dismissing appeal of alien who disregarded court order to report for deportation and could no longer be located).

Ofosu will be deported only if the INS can find him to arrest him. It is of course much harder to deport a person who is at large than a person who is in custody. According to his counsel, Ofosu can be found at his home address as well as his place of employment, both known to the authorities. Nevertheless, he is a fugitive in the sense that the INS must deploy resources to bring him in. And, of course, he may not be so easy to find once his litigation options are exhausted. Certainly, the INS cannot count on him to present himself during any stay so that they can keep track of his whereabouts. By ignoring INS directives and refusing to pres-

ent himself, Ofosu preserves the opportunity to deny the INS ultimate success on this appeal and deliberately increases the risks of flight and delay.

■ *The Merits.* We cannot say that there is no substantial possibility of success on appeal. The BIA opinion rests on the proposition that Ofosu's change of heart and redemptive conduct do not warrant consideration for asylum despite his earlier involvement in the activities of the CDR. We think that is a debatable holding. The district court had no doubts, stating:

> The petitioner, after some years of employment as a persecutor, now abjures that career choice. However, commendable his conversion, Congress did not enact an exception to the statute at issue which absolves a persecutor of his past on account of a belated crisis of conscience.

The opinion of the district court treats Ofosu's "conversion" as a tactical device. That may be; indeed, the immigration judge found that Ofosu's testimony on this was "unsubstantiated and conclusory." But the BIA, which would review that finding, did not reach it because the BIA decided that Ofosu's prior conduct made him ineligible for asylum.

Ofosu's case does not fit neatly into the statutory provisions relied upon by the BIA and the district court. We have never addressed the meaning of the phrase "ordered, incited, assisted, or otherwise participated in ... persecution" as employed in the exception to the definition of a refugee, INA § 101(a)(42), 8 U.S.C. § 1101(a)(42), or as employed in the exception to the statutory eligibility of an alien for the withholding of return, INA § 243(h)(2)(A), 8 U.S.C. § 1253(h)(2)(A). We certainly have not addressed the meaning of the phrase in the context presented by Ofosu's testimony. The United States Attorney agrees. In a letter dated May 21, 1996 to the district judge, the Special Assistant United States Attorney in charge of this case wrote:

> Our research has revealed no caselaw in this or any other jurisdiction interpreting the pertinent language of 8 U.S.C. § 1101(a)(42). Thus, the Government believes that published authority addressing this issue would be extremely useful.

While it seems clear that "personal culpability" is required for the denial of asylum on the ground of participation in persecution, *see McMullen v. INS,* 788 F.2d 591, 598 n. 2 (9th Cir.1986), our interpretation of other immigration legislation indicates that personal involvement in killing or torture is not necessary to impose responsibility for assisting or participating in persecution, *see, e.g., Maikovskis v. INS,* 773 F.2d 435, 438, 446 (2d Cir.1985), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986) (finding culpable a policeman who brought residents to police station but did not assist in their execution); *see also Fedorenko v. United States,* 449 U.S. 490, 500, 512, 101 S.Ct. 737, 744, 750, 66 L.Ed.2d 686 (1981) (holding culpable a concentration camp guard who knew that inmates were being murdered but did not participate in murders). However, in none of the cases relating to involvement in persecution did it appear that one who assisted or participated in any degree ultimately rejected the repressive activities in which he was involved, or put himself at risk in order to protect those who were persecuted. Moreover, Ofosu contends that the CDR came to engage in repressive activities sometime after he joined it and that it originally was an organization devoted to assisting the government in ways that were beneficial to the populace. It is not clear how soon after he began participating in human rights violations that he claims to have turned away from such conduct. In agreement with the government, we therefore think that an "interpret[ation] [of] the pertinent language of 8 U.S.C. § 1101(a)(42)" by this court "would be extremely useful," and we also think that this case presents a factual context in which thorough briefing and argument of the issue is warranted.

*The Public Interest.* The public interest raises a broader question than what difference it may make to the public if Ofosu himself remains at large another six or nine months. The court that first articulated the relevance of this factor emphasized that the public interest may be the paramount consid-

eration when a broad regulatory scheme is at stake:

> In litigation involving the administration of regulatory statutes designed to promote the public interest, this factor necessarily becomes crucial. The interests of private litigants must give way to the realization of public purposes. The public interest may, of course, have many faces.... We must determine, these many facets considered, how the court's action serves the public best.

*Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir. 1958); *see also* 11 Charles A. Wright *et al., Federal Practice and Procedure* § 2904, 501 n. 9 (1995) (observing that four-factor standard for granting stay was first articulated in *Virginia Petroleum Jobbers Ass'n* ). " 'Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.' " *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 179–80, 94 S.Ct. 414, 423, 38 L.Ed.2d 388 (1973) (quoting *Virginian Ry. v. System Fed'n No. 40,* 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937)); *see also RTC v. Elman,* 949 F.2d 624, 629 (2d Cir.1991). In staying administrative orders, courts give significant weight to the public interest served by the proper operation of the regulatory scheme. *See Hamlin Testing Labs., Inc. v. United States Atomic Energy Comm'n,* 337 F.2d 221, 222–23 (6th Cir.1964) (denying stay in deference "to the expert judgment of the Commission as a coordinate agency of government specially created to further public purposes" of regulating radioactive materials); *Associated Sec. Corp. v. SEC,* 283 F.2d 773, 775 (10th Cir.1960) (denying stay of SEC order because otherwise "[the court] would, in effect, be substituting [its] judgment as to the public interest for that of the [SEC]"); *Accident Fund v. Baerwaldt,* 579 F.Supp. 724, 728 (W.D.Mich.1984) (public interest in operation of workers' compensation insurance favored denial of stay that would interfere with state officials' express statutory powers); *Lewis v. Richardson,* 428 F.Supp. 1164, 1171 (D.Mass.1977) (although other factors favored plaintiffs, court denied request for temporary restraining order because "the federal defendants are presumed to be acting in furtherance of the vastly greater national interests which [the project grants statute] is intended to benefit").

■ There is a strong public interest in compliance with the immigration laws by aliens who seek the protection of those laws. In deciding whether to grant or deny a stay of exclusion, an alien's non-cooperation is a important fact. Otherwise, certain terrible things would happen.

First, the system of parole for illegal aliens may break down. That system depends upon voluntary compliance and the willingness of those who benefit to keep their word. Ofosu calculates that the INS lacks the resources to conduct a dragnet. In this, Ofosu (who has some expertise in the area of law enforcement) is correct. However, if Ofosu's abuse becomes general, it will imperil the system of parole and increase the number of refugees who are behind bars. Many of these people will be genuine refugees from oppression. In ruling on this stay, we consider whether what we do will encourage others to respect their parole status. Justice will not be served if Ofosu's non-cooperation is seen to be without cost by others similarly situated, and the system of parole thereby becomes unfeasible.

Second, the grant of a stay to Ofosu while he is still a fugitive may tend to increase procedural delay and multiply meritless appeals. Aliens who stave off prompt exclusion by seeking asylum have greater incentive to prolong and multiply procedural initiatives when they are at large and free to work and travel than while they are in custody.

Third, granting of a stay under these circumstances would discourage respect for American law on the part of people who are petitioning to remain here. Everyone understands that the INS is overwhelmed with petitioners and procedures, and that it heavily relies on the word and voluntary compliance of numerous aliens within our borders. It is easy to game this system, but we should not treat disregard of INS directives as a

norm that has no bearing on the availability of equitable relief.

We are modifying our stay of exclusion and deportation by imposing the condition that Ofosu surrender for possible revocation of parole. If he does not comply with that condition and is deported, we would lose our jurisdiction over this appeal. But our only jurisdiction here rests on habeas corpus, which is based on custody or some analog of custody. 28 U.S.C. §§ 2241(c), 2255; *Jones v. Cunningham*, 371 U.S. 236, 238–40, 83 S.Ct. 373, 374–76, 9 L.Ed.2d 285 (1963); *see also Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 893–94 (2d Cir.1996). We will not exercise our habeas jurisdiction to issue a stay on behalf of someone who incontestably *should* be in the custody of the INS, but is not. The condition on this stay does not impair Ofosu's access to the Court. It puts him on the same footing as every other litigant who needs a stay to vindicate a right, and who therefore must bear the burden of showing entitlement to equitable relief. "It is a principle of general application that courts ... may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest." *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 492, 62 S.Ct. 402, 405, 86 L.Ed. 363 (1942).

Chiefly for those reasons, the public interest is disserved in this case by an unconditional stay of exclusion.

### Conclusion

After weighing the four factors relevant to the grant of a stay, we entered an order on September 27, 1996, which modified our June 26, 1996 grant of a stay of exclusion, and provided that: "the stay ends at 1 P.M. on October 10, 1996, unless Petitioner–Appellant presents himself on that date and before that time (or at such earlier date and time as the parties may arrange) at the office of the Immigration and Naturalization Service at 26 Federal Plaza in New York City. If he does so report, the stay will continue during the pendency of the appeal. The Respondent–Appellee's cross-motion to dismiss the appeal on the ground of fugitive entitlement is denied as moot."