**Maurice CLARETT, Plaintiff,**

v.

**NATIONAL FOOTBALL LEAGUE, Defendant.**

**No. 03 Civ.7441 SAS.**

United States District Court,
S.D. New York.

Feb. 11, 2004.

Alan C. Milstein, Jeffrey P. Resnick, Sherman, Silverstein, Kohl, Rose & Podolsky, Pennsauken, New Jersey, Robert A. Skirnick, Daniel B. Allanoff, Meredith Cohen Greenfogel & Skirnick, New York,

New York, John B. Langel, Burt M. Rublin, Amy L. Weiss, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania, Prof. Robert A. McCormick, Michigan State University, Detroit College of Law, East Lansing, Michigan, for Plaintiff.

Gregg H. Levy, Joshua D. Wolson, James M. Garland, Benjamin C. Block, Covington & Burling, Washington, D.C., Jessica L. Malman, Covington & Burling, New York, New York, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

The National Football League ("NFL") is seeking a stay of the Court's Opinion and Order dated February 5, 2004, granting summary judgment to Maurice Clarett.[1]

■ Absent special circumstances not present here, "[a]pplication for a stay of the judgment or order of a district court pending appeal . . . must ordinarily be made in the first instance in the district court."[2] "A party seeking a stay of a lower court's order bears a difficult burden."[3] In this Circuit, four criteria are relevant in determining whether to issue a stay pending appeal:

(1) whether the *movant* will suffer *irreparable injury* absent a stay, (2) whether a party [opposing the stay] will suffer *substantial injury* if a stay is issued, (3) whether the *movant* has demonstrated a *substantial possibility*, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected.[4]

Because the NFL has failed to meet its burden, no stay may issue.

■ As to the first two factors, there is little doubt that a stay would result in substantial injury to Clarett while, absent a stay, the NFL would suffer some harm, but not irreparable harm. Because the NFL's draft is scheduled to take place in April 2004 and will likely occur before the Court of Appeals has an opportunity to rule in this case, the issuance of a stay will largely determine the rights of the parties.

If a stay issues, Clarett will be precluded from entering the 2004 draft and may lose a year of playing time in the NFL – itself a "very detrimental" injury.[5] Even if Clarett is permitted to play college football next year, the possibility of an injury could preclude him from ever playing professional football, a serious threat not easily remedied by monetary damages. The hardship that a stay would impose on Clarett, therefore, is irremediable – a graver harm than the "substantial injury" that the Second Circuit's test requires – a consideration that weighs strongly against the issuance of a stay.

At the same time, there can be no denying that in the absence of a stay, the NFL will also suffer harm. Teams will make personnel decisions – including trades, releasing old players and drafting new players – in accordance with the February 5 Order. If that Order is subsequently reversed on appeal, at worst, the NFL will be forced to tolerate the handful of younger players who are selected in the 2004 draft. What would amount to a one year suspension of the League's eligibility rule

---

1. See *Clarett v. National Football League*, No. 03 Civ. 7441, 2004 WL 221325 (S.D.N.Y. Feb. 5, 2004).

2. Fed. R.App. P. 8(a).

3. *United States v. Private Sanitation Indus. Ass'n*, 44 F.3d 1082, 1084 (2d Cir.1995).

4. *Hirschfeld v. Board of Elections*, 984 F.2d 35, 39 (2d Cir.1993) (emphasis added); *see also Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir.2002).

5. See *Linseman v. World Hockey Ass'n*, 439 F.Supp. 1315, 1317 (D.Conn.1977).

scarcely imposes any great hardship on the NFL or its teams. Given the imminence of the combines and draft, it seems unlikely that many younger players will declare so late in the game.

Many of the other harms posited by the NFL are illusory. For example, the League complains that "[a]s a result of the Court's Order, 32 NFL clubs will each be forced to evaluate, assess, work out and interview a large number of prospective NFL players who had previously been deemed ineligible." [6] But the teams would only have to work out the few players who actually declare for the 2004 draft – players who are likely already well-known to pro scouts – not thousands of college underclassmen. The League also cites the potential harm to players who declare but are not drafted and thereby forfeit their college eligibility. *First,* this argument does not demonstrate irreparable harm *to the NFL.* And *second,* it simply is not true. As the NFL itself points out, NCAA rules permit a player who declares for the draft but is not selected to retain his eligibility under certain conditions. [7]

The next factor – the existence of a substantial possibility of success on appeal – also tips against issuing a stay. Contrary to the NFL's argument, most of the rules governing this case were established decades ago; none of the essential holdings in the February 5 Order were based on novel legal theories. [8] Indeed, the legal framework for that decision was laid in a long line of Supreme Court precedent including *Brown v. Pro Football, Inc.,* [9] *Atlantic Richfield Co. v. USA Petroleum Co.,* [10] and *NCAA v. Board of Regents.* [11]

That the legal rules applicable to this case are relatively well-settled is especially important in light of the irreparable harm to Clarett. Where the party opposing a stay will suffer irreparable harm, the movant must make a *particularly* strong showing of its likely success on appeal. [12] In short, the substantial possibility of success on appeal is only one of four factors which must be "weigh[ed]" against each other; no single factor is determinative. [13]

The public interest also favors denying the stay. Although some non-parties

---

6. Memorandum in Support of the National Football League's Motion for Stay Pending Appeal at 3.

7. *See* NCAA Bylaw 12.2.4.2.3.

8. Moreover, the holdings that the League criticizes most heavily were merely fallback positions or holdings in the alternative. Even if the Court of Appeals were to completely repudiate certain of these holdings – for example, that the Rule was not collectively bargained, or that less restrictive alternatives to the Rule exist – the February 5 Order would stand.

9. 518 U.S. 231, 236, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996) (holding that, for the nonstatutory labor exemption to apply, the questioned practice must pertain to a mandatory subject of collective bargaining and been the subject of actual arm's length negotiations).

10. 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (holding that an antitrust plaintiff has standing if his injury flows from the anti-

competitive aspects of the challenged practice)

11. 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (permitting "quick look" rule of reason analysis where anticompetitive effects of the challenged practice were obvious)

12. *See Mohammed,* 309 F.3d at 101 ("The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff[ ] will suffer absent the stay.") (alteration in original) (quoting *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir.1991)).

13. *See Ofosu v. McElroy,* 98 F.3d 694, 703 (2d Cir.1996); *see also Mohammed,* 309 F.3d at 101 (holding that "more of one [factor] excuses less of the other") (citations omitted).

might be injured in the absence of a stay if the ruling is eventually reversed on appeal, the overarching public interest lies in the fair and efficient operation of the marketplace and, in this case, open competition in the NFL.[14] The NFL's concern that younger players will overtrain or resort to steroid use – while perhaps a valid worry if my ruling is upheld – makes no sense in the context of a stay. The NFL has set a deadline of March 1, 2004, for previously ineligible players to declare for the draft. The deadline for players who wish to participate in the scouting combines is February 15. It is extremely unlikely that younger players will overtrain or turn to steroid use in the period between now and the end of the month. In short, the *real* effects of the February 5 Order will not be felt until the 2005 draft; by then, it is likely that the Court of Appeals will have ruled.

Finally, I note that in the Spencer Haywood case, the Supreme Court denied a stay in a case similar to this one.[15] There, the district court had granted a preliminary injunction invalidating the National Basketball Association's eligibility rule, as it applied to Haywood, that barred players not four years removed from high school. Pending appeal, the Court of Appeals for the Ninth Circuit issued a stay of the district court's order. But the Supreme Court reversed the stay and reinstated the district court's order, noting that in Justice Douglas's view, the "group boycott issue in professional sports is a significant one." [16] Although *Haywood* was decided in 1971, no case squarely presenting a group boycott rooted in an age-based eligibility rule has since reached the Supreme Court. The

issue in this case, therefore, is no less significant than the issue in *Haywood.* And as Justice Douglas concluded, the potential injury to Haywood was greater than the potential injury to the NBA.[17]

Accordingly, a weighing of the relevant factors and case law plainly counsels against the issuance of a stay. In my February 5 Order, I held that, as a matter of law, Clarett is eligible to participate in the 2004 draft. It would be perverse indeed to stay that order pending appeal. If a stay is granted, Clarett will miss the 2004 draft. He will not be eligible to play in the NFL until the 2005 draft, when he would have been eligible under the current Rule. If the stay is granted, Clarett will have effectively *lost* his lawsuit. Moreover, his appeal – insofar as it concerns Clarett – will be moot. The motion for a stay pending appeal is therefore denied.

SO ORDERED.

---

14. *See Bowman v. National Football League,* 402 F.Supp. 754, 756 (D.Minn.1975) ("Professional sports and the public are better served by open unfettered competition for playing positions.").

15. *See Haywood v. National Basketball Ass'n,* 401 U.S. 1204, 1206, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971) (Douglas, Circuit Justice).

16. *Id.* at 1206.

